# RIZZO, MAYOR OF PHILADELPHIA, ET AL. *v.* GOODE ET AL.

No. 74–942.   Argued November 11, 1975—Decided January 21, 1976

364

RENHQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and POWELL, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 381. STEVENS, J., took no part in the consideration or decision of the case.

*James M. Penny, Jr.,* argued the cause for petitioners. With him on the briefs was *Stephen Arinson.*

*Peter Hearn* argued the cause for respondents. With him on the brief were *Nancy J. Gellman, Jack J. Levine, William Lee Akers,* and *Harry Lore.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The District Court for the Eastern District of Pennsylvania, after parallel trials of separate actions [1] filed

---

*Briefs of *amici curiae* urging affirmance were filed by *Peter Van N. Lockwood, David Bonderman, J. Harold Flannery, Paul R. Dimond, William E. Caldwell,* and *Norman J. Chachkin* for the Lawyers' Committee for Civil Rights under Law; by *Barry S. Kohn,* Deputy Attorney General, *Vincent X. Yakowicz,* Solicitor General, and *Robert P. Kane,* Attorney General, for the Commonwealth of Pennsylvania; by *Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston,* and *Drew S. Days III* for the NAACP Legal Defense and Educational Fund, Inc.; by *Robert M. Landis* and *Samuel T. Swansen* for the Philadelphia Bar Association; by *Anthony G. Amsterdam, Melvin L. Wulf, Joel M. Gora,* and *Sanford J. Rosen* for the American Civil Liberties Union et al.; and by *Frederic L. Ballard* for the Greater Philadelphia Movement.

[1] The complaint in the first action, filed in February 1970 and styled *Goode* v. *Rizzo,* was brought by respondent Goode and two other individuals. The second, filed in September 1970 and styled *COPPAR* v. *Tate,* was brought by 21 individuals and four organizations: the Council of Organizations on Philadelphia Police Accountability and Responsibility (COPPAR), an unincorporated association

in 1970, entered an order in 1973 requiring petitioners "to submit to [the District] Court for its approval a comprehensive program for improving the handling of citizen complaints alleging police misconduct" in accordance with a comprehensive opinion filed together with the order. The proposed program, negotiated between petitioners and respondents for the purpose of complying with the order, was incorporated six months later into a final judgment. Petitioner City Police Commissioner was thereby required, *inter alia,* to put into force a directive governing the manner by which citizens' complaints against police officers should henceforth be handled by the department.[2] The Court of Appeals for

composed of some 32 constituent community organizations; the Southern Christian Leadership Conference, whose principal office is in Atlanta, Ga.; and the Black Panther Party and the Young Lords Party, unincorporated associations of black citizens and citizens of Spanish origin, respectively. The latter two groups, of which some of the individual complainants in *COPPAR* were members, were ultimately dismissed as parties by the District Court for failure to submit to discovery. Both complaints named as defendants those officials then occupying the offices of Mayor, City Managing Director (who supervises and, with the Mayor's approval, appoints the Police Commissioner), and the Police Commissioner, who has direct supervisory power over the department. Two other police supervisors subordinate to the Commissioner were also named defendants. Both actions were permitted to proceed as class actions, with the individual respondents representing all residents of Philadelphia and an "included" class of all black residents of that city. For a thorough account of the procedural background of this case, see the District Court's opinion. *COPPAR* v. *Rizzo,* 357 F. Supp. 1289 (1973).

[2] A judgment of considerable detail was entered against petitioners, appropriate substitution having been made in 1973 of the current officeholders, including petitioner Rizzo, by then Mayor. See n. 1, *supra.* The existing procedure for handling complaints, embodied in the 2½-page "Directive 127" (March 1967), was expanded to an all-encompassing 14-page document reflecting the revisions suggested by the District Court's "guidelines." See *infra,* at 369–370. Di-

the Third Circuit, upholding the District Court's finding that the existing procedures for handling citizen complaints were "inadequate," affirmed the District Court's choice of equitable relief: "The revisions were . . . ordered because they appeared to have the potential for prevention of future police misconduct." 506 F. 2d 542, 548 (1974). We granted certiorari to consider petitioners' claims that the judgment of the District Court represents an unwarranted intrusion by the federal judiciary into the discretionary authority committed to them by state and local law to perform their official functions. We find ourselves substantially in agreement with these claims, and we therefore reverse the judgment of the Court of Appeals.

I

The central thrust of respondents' efforts in the two trials was to lay a foundation for equitable intervention, in one degree or another, because of an assertedly pervasive pattern of illegal and unconstitutional mistreatment by police officers. This mistreatment was said to have been directed against minority citizens in particular

---

rective 127 as revised was ordered by the District Court to be promulgated as such by the Police Commissioner and posted in various public areas, with copies provided anyone who either requested one or inquired generally into the procedure for lodging complaints. A "Citizen's Complaint Report" was ordered drawn up in a format designated by the court, with copies to be printed and available in sufficient quantities to the public in several locations. The department was further ordered to propose a police recruit training manual reflective of the court's "guidelines," with respondents then having the chance to proffer alternative suggestions. Finally, the department was directed to maintain adequate statistical records and annual summaries to provide a basis for the court's "evaluation" of the program as ordered; the court reserved jurisdiction to review petitioners' progress in these areas and to grant further relief as might be appropriate. Pet. for Cert. 20a–37a.

and against all Philadelphia residents in general. The named individual and group respondents were certified to represent these two classes. The principal petitioners here—the Mayor, the City Managing Director, and the Police Commissioner—were charged with conduct ranging from express authorization or encouragement of this mistreatment to failure to act in a manner so as to assure that it would not recur in the future.

Hearing some 250 witnesses during 21 days of hearings, the District Court was faced with a staggering amount of evidence; each of the 40-odd incidents might alone have been the *pièce de résistance* of a short, separate trial. The District Court carefully and conscientiously resolved often sharply conflicting testimony, and made detailed findings of fact,[3] which both sides now accept, with respect to eight of the incidents presented by the *Goode* respondents and with respect to 28 of those presented by *COPPAR*.[4]

The principal antagonists in the eight incidents recounted in *Goode* were Officers DeFazio and D'Amico, members of the city's "Highway Patrol" force. They were not named as parties to the action. The District Court found the conduct of these officers to be violative of the constitutional rights of the citizen complainants in three [5] of the incidents, and further found that complaints to the police Board of Inquiry had resulted in one case in a relatively mild five-day suspension and in another case a conclusion that there was no basis for disciplinary action.

In only two of the 28 incidents recounted in *COPPAR*

---

[3] Each of the incidents in *Goode* and *COPPAR* is set out in full detail in the District Court's opinion. 357 F. Supp., at 1294–1316. For present purposes we need only highlight those findings.

[4] See n. 1, *supra*.

[5] Incidents "1" through "3." 357 F. Supp., at 1294–1297.

(which ranged in time from October 1969 to October 1970) did the District Court draw an explicit conclusion that the police conduct amounted to a deprivation of a federally secured right; it expressly found no police misconduct whatsoever in four of the incidents; and in one other the departmental policy complained of was subsequently changed. As to the remaining 21, the District Court did not proffer a comment on the degree of misconduct that had occurred: whether simply improvident, illegal under police regulations or state law, or actually violative of the individual's constitutional rights. Respondents' brief asserts that of this latter group, the facts as found in 14 of them "reveal [federal] violations." [6] While we think that somewhat of an overstatement, we accept it, *arguendo,* and thus take it as established that, insofar as the *COPPAR* record reveals, there were 16 incidents occurring in the city of Philadelphia over a year's time in which numbers of police officers violated citizens' constitutional rights. Additionally, the District Court made reference to citizens' complaints to the police in seven of those 16; in four of which, involving conduct of constitutional dimension, the police department received complaints but ultimately took no action against the offending officers.

The District Court made a number of conclusions of law, not all of which are relevant to our analysis. It found that the evidence did not establish the existence of any policy on the part of the named petitioners to violate the legal and constitutional rights of the plaintiff classes, but it did find that evidence of departmental procedure indicated a tendency to discourage the filing of civilian complaints and to minimize the consequences of police

---

[6] This textual summary of the District Court's findings with respect to the *COPPAR* incidents is taken from the Brief for Respondents 14–15, and n. 18

misconduct.   It found that as to the larger plaintiff class, the residents of Philadelphia, only a small percentage of policemen commit violations of their legal and constitutional rights, but that the frequency with which such violations occur is such that "they cannot be dismissed as rare, isolated instances." *COPPAR* v. *Rizzo*, 357 F. Supp. 1289, 1319 (1973).   In the course of its opinion, the District Court commented:

> "In the course of these proceedings, much of the argument has been directed toward the proposition that courts should not attempt to supervise the functioning of the police department. Although, contrary to the defendants' assertions, the Court's legal power to do just that is firmly established, . . . I am not persuaded that any such drastic remedy is called for, at least initially, in the present cases." *Id.*, at 1320.

The District Court concluded by directing petitioners to draft, for the court's approval, "a comprehensive program for dealing adequately with civilian complaints," to be formulated along the following "guidelines" suggested by the court:

> "(1) Appropriate revision of police manuals and rules of procedure spelling out in some detail, in simple language, the 'dos and don'ts' of permissible conduct in dealing with civilians (for example, manifestations of racial bias, derogatory remarks, offensive language, etc.; unnecessary damage to property and other unreasonable conduct in executing search warrants; limitations on pursuit of persons charged only with summary offenses; recording and processing civilian complaints, etc.).   (2) Revision of procedures for processing complaints against police, including (a) ready availability of forms for use by civilians in lodging complaints against police

officers; (b) a screening procedure for eliminating frivolous complaints; (c) prompt and adequate investigation of complaints; (d) adjudication of nonfrivolous complaints by an impartial individual or body, insulated so far as practicable from chain of command pressures, with a fair opportunity afforded the complainant to present his complaint, and to the police officer to present his defense; and (3) prompt notification to the concerned parties, informing them of the outcome." *Id.,* at 1321.

While noting that the "guidelines" were consistent with "generally recognized minimum standards" and imposed "no substantial burdens" on the police department, the District Court emphasized that respondents had no constitutional *right* to improved police procedures for handling civilian complaints. But given that violations of constitutional rights of citizens occur in "unacceptably" high numbers, and are likely to continue to occur, the court-mandated revision was a "necessary first step" in attempting to prevent future abuses. *Ibid.* On petitioners' appeal the Court of Appeals affirmed.

## II

These actions were brought, and the affirmative equitable relief fashioned, under the Civil Rights Act of 1871, 42 U. S. C. § 1983. It provides that "[e]very person who, under color of [law] subjects, or causes to be subjected, any . . . person within the jurisdiction [of the United States] to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity . . . ." The plain words of the statute impose liability—whether in the form of payment of redressive damages or being placed under an injunction—only for conduct which "subjects, or causes to be subjected" the

complainant to a deprivation of a right secured by the Constitution and laws.

The findings of fact made by the District Court at the conclusion of these two parallel trials—in sharp contrast to that which respondents sought to prove with respect to petitioners—disclose a central paradox which permeates that court's legal conclusions. Individual police officers *not named as parties* to the action were found to have violated the constitutional rights of particular individuals, only a few of whom were parties plaintiff. As the facts developed, there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct. Instead, the *sole* causal connection found by the District Court between petitioners and the individual respondents was that in the absence of a change in police disciplinary procedures, the incidents were likely to continue to occur, *not* with respect to them, but as to the members of the classes they represented. In sum, the genesis of this lawsuit—a heated dispute between individual citizens and certain policemen—has evolved into an attempt by the federal judiciary to resolve a "controversy" between the entire citizenry of Philadelphia and the petitioning elected and appointed officials over what steps might, in the Court of Appeals' words, "[appear] to have the potential for prevention of future police misconduct." 506 F. 2d, at 548. The lower courts have, we think, overlooked several significant decisions of this Court in validating this type of litigation and the relief ultimately granted.

## A

We first of all entertain serious doubts whether on the facts as found there was made out the requisite Art. III

case or controversy between the individually named respondents and petitioners. In *O'Shea* v. *Littleton,* 414 U. S. 488 (1974), the individual respondents, plaintiffs in the District Court, alleged that petitioners, a county magistrate and judge, had embarked on a continuing, intentional practice of racially discriminatory bond setting, sentencing, and assessing of jury fees. No specific instances involving the individual respondents were set forth in the prayer for injunctive relief against the judicial officers. And even though respondents' counsel at oral argument had stated that some of the named respondents had in fact "suffered from the alleged unconstitutional practices," the Court concluded that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *Id.,* at 495–496. The Court further recognized that while "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," the attempt to anticipate under what circumstances the respondents there would be made to appear in the future before petitioners "takes us into the area of speculation and conjecture." *Id.,* at 496–497. These observations apply here with even more force, for the individual respondents' claim to "real and immediate" injury rests not upon what the named petitioners might do to them in the future—such as set a bond on the basis of race—but upon what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of departmental disciplinary procedures. This hypothesis is even more attenuated than those allegations of future injury found insufficient in *O'Shea* to warrant invocation of federal jurisdiction. Thus, insofar as the individual respondents were concerned, we think they lacked the requisite "per-

sonal stake in the outcome," *Baker* v. *Carr*, 369 U. S. 186, 204 (1962), *i. e.*, the order overhauling police disciplinary procedures.

## B

That conclusion alone might appear to end the matter, for *O'Shea* also noted that "if none of the named plaintiffs . . . establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class" which they purport to represent. 414 U. S., at 494. But, unlike *O'Shea,* this case did not arise on the pleadings. The District Court, having certified the plaintiff classes,[7] bridged the gap between the facts shown at trial and the class-wide relief sought with an unprecedented theory of § 1983 liability. It held that the classes' § 1983 actions for equitable relief against petitioners were made out on a showing of an "unacceptably high" number of those incidents of constitutional dimension—some 20 in all—occurring at large in a city of three million inhabitants, with 7,500 policemen.

Nothing in *Hague* v. *CIO*, 307 U. S. 496 (1939), the only decision of this Court cited by the District Court,[8]

---

[7] The Court of Appeals noted that petitioners had in their appeal raised no question of the propriety of the class designation under Fed. Rule Civ. Proc. 23. That issue is therefore not before us, and we express no opinion upon it.

[8] *Lankford* v. *Gelston*, 364 F. 2d 197 (CA4 1966), was also cited by the District Court for the proposition that federal courts have the legal power to "supervise the functioning of the police department." 357 F. Supp., at 1320. But the court in *Lankford* intimated no such power, and the facts which confronted it are obviously distinguishable. There, in executing an "evil practice that has long and notoriously persisted in the Police Department," the police, searching over a 19-day period for two black men who murdered one of their ranks, conducted some 300 warrantless searches ·of private residences in a predominately Negro area "at all hours of

or any other case from this Court, supports such an open-ended construction of § 1983. In *Hague,* the pattern of police misconduct upon which liability and injunctive relief were grounded was the adoption and enforcement of deliberate policies by the defendants there (including the Mayor and the Chief of Police) of excluding and removing the plaintiff's labor organizers and forbidding peaceful communication of their views to the citizens of Jersey City. These policies were implemented "by force and violence" on the part of individual policemen. There was no mistaking that the defendants proposed to continue their unconstitutional policies against the members of this discrete group.

Likewise, in *Allee* v. *Medrano,* 416 U. S. 802 (1974), relied upon by the Court of Appeals and respondents here, we noted:

> "The complaint charged that the enjoined conduct was but one part of a *single plan* by the defendants, and the District Court found a *pervasive pattern of intimidation* in which the law enforcement authorities sought to suppress appellees' constitutional rights. In this blunderbuss effort the police not only relied on statutes . . . found constitutionally deficient, but concurrently exercised their authority

the day and night" on nothing more than "unverified anonymous [telephone] tips." 364 F. 2d, at 198, and 205 n. 9. This "series of the most flagrant invasions of privacy ever to come under the scrutiny of a federal court" arose out of what several experienced police officers testified was a "routine practice" in "serious cases." *Id.,* at 200–201. Injunctive relief under § 1983 was granted against the defendant Police Commissioner because the wholesale raids were the "effectuation of a plan conceived by high ranking [police] officials," a practice which in the interim the defendant had "renounced only obliquely, if at all," and as to which "the danger of repetition has not been removed." *Id.,* at 202, 204.

under valid laws in an unconstitutional manner."
*Id.,* at 812 (emphasis added).

The numerous incidents of misconduct on the part of the *named* Texas Rangers, as found by the District Court and summarized in this Court's opinion, established beyond peradventure not only a "persistent pattern" but one which flowed from an intentional, concerted, and indeed conspiratorial effort to deprive the organizers of their First Amendment rights and place them in fear of coming back. *Id.,* at 814–815.

Respondents stress that the District Court not only found an "unacceptably high" number of incidents but held, as did the Court of Appeals, that "when a *pattern* of frequent police violations of rights is shown, the law is clear that injunctive relief may be granted." 357 F. Supp., at 1318 (emphasis added). However, there was no showing that the behavior of the Philadelphia police was different in kind or degree from that which exists elsewhere; indeed, the District Court found "that the problems disclosed by the record . . . are fairly typical of [those] afflicting police departments in major urban areas." *Ibid.* Thus, invocation of the word "pattern" in a case where, unlike *Hague* and *Medrano,* the defendants are not causally linked to it, is but a distant echo of the findings in those cases. The focus in *Hague* and *Medrano* was not simply on the number of violations which occurred but on the common thread running through them: a "pervasive pattern of intimidation" flowing from a deliberate plan by the *named* defendants to crush the nascent labor organizations. *Medrano, supra,* at 812. The District Court's unadorned finding of a statistical pattern is quite dissimilar to the factual settings of these two cases.

The theory of liability underlying the District Court's opinion, and urged upon us by respondents, is that even

without a showing of direct responsibility for the actions of a small percentage of the police force, petitioners' *failure* to act in the face of a statistical pattern is indistinguishable from the active conduct enjoined in *Hague* and *Medrano*. Respondents posit a constitutional "duty" on the part of petitioners (and a corresponding "right" of the citizens of Philadelphia) to "eliminate" future police misconduct; a "default" of that affirmative duty being shown by the statistical pattern, the District Court is empowered to act in petitioners' stead and take whatever preventive measures are necessary, within its discretion, to secure the "right" at issue. Such reasoning, however, blurs accepted usages and meanings in the English language in a way which would be quite inconsistent with the words Congress chose in § 1983. We have never subscribed to these amorphous propositions, and we decline to do so now.

Respondents claim that the theory of liability embodied in the District Court's opinion is supported by desegregation cases such as *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971). But this case, and the long line of precedents cited therein, simply reaffirmed the body of law originally enunciated in *Brown* v. *Board of Education,* 347 U. S. 483 (1954):

> "Nearly 17 years ago this Court held, in explicit terms, that state-imposed segregation by race in public schools denies equal protection of the laws. At no time has the Court deviated in the slightest degree from that holding or its constitutional underpinnings.
>
> .　　.　　.　　.　　.
>
> "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexi-

bility are inherent in equitable remedies." *Swann, supra,* at 11, 15.

Respondents, in their effort to bring themselves within the language of *Swann,* ignore a critical factual distinction between their case and the desegregation cases decided by this Court. In the latter, segregation imposed by law had been implemented by state authorities for varying periods of time, whereas in the instant case the District Court found that the responsible authorities had played no affirmative part in depriving any members of the two respondent classes of any constitutional rights. Those against whom injunctive relief was directed in cases such as *Swann* and *Brown* were not administrators and school board members who had in their employ a small number of individuals, which latter on their own deprived black students of their constitutional rights to a unitary school system. They were administrators and school board members who were found by their *own* conduct in the administration of the school system to have denied those rights. Here, the District Court found that none of the petitioners had deprived the respondent classes of any rights secured under the Constitution. Under the well-established rule that federal "judicial powers may be exercised only on the basis of a constitutional violation," *Swann, supra,* at 16, this case presented no occasion for the District Court to grant equitable relief against petitioners.

## C

Going beyond considerations concerning the existence of a live controversy and threshold statutory liability, we must address an additional and novel claim advanced by respondent classes. They assert that given the citizenry's "right" to be protected from unconstitutional exercises of police power, and the "need for protection from

378

such abuses," respondents have a right to mandatory equitable relief in some form when those in supervisory positions do not institute steps to reduce the incidence of unconstitutional police misconduct.[9]  The scope of federal equity power, it is proposed, should be extended to the fashioning of prophylactic procedures for a state agency designed to minimize this kind of misconduct on the part of a handful of its employees.  However, on the facts of this case, not only is this novel claim quite at odds with the settled rule that in federal equity cases "the nature of the violation determines the scope of the remedy," *ibid.*, but important considerations of federalism are additional factors weighing against it. Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the "special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."  *Stefanelli* v. *Minard*, 342 U. S. 117, 120 (1951), quoted in *O'Shea* v. *Littleton,* 414 U. S., at 500.

Section 1983 by its terms confers authority to grant equitable relief as well as damages, but its words "allow a suit in equity only when that is the proper proceeding for redress, and they refer to existing standards to determine what is a proper proceeding."  *Giles* v. *Harris,* 189 U. S. 475, 486 (1903) (Holmes, J.).  Even in an action between private individuals, it has long been held that an injunction is "to be used sparingly, and only in a clear and plain case."  *Irwin* v. *Dixion,* 9 How. 10, 33 (1850).  When a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with "the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal

---

[9] Brief for Respondents 34–35.

affairs,' *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 896 (1961)," quoted in *Sampson* v. *Murray*, 415 U. S. 61, 83 (1974). The District Court's injunctive order here, significantly revising the internal procedures of the Philadelphia police department, was indisputably a sharp limitation on the department's "latitude in the 'dispatch of its own internal affairs.' "

When the frame of reference moves from a unitary court system, governed by the principles just stated, to a system of federal courts representing the Nation, subsisting side by side with 50 state judicial, legislative, and executive branches, appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief. *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 928 (1975).

So strongly has Congress weighted this factor of federalism in the case of a state criminal proceeding that it has enacted 28 U. S. C. § 2283 to actually deny to the district courts the authority to issue injunctions against such proceedings unless the proceedings come within narrowly specified exceptions. Even though an action brought under § 1983, as this was, is within those exceptions, *Mitchum* v. *Foster*, 407 U. S. 225 (1972), the underlying notions of federalism which Congress has recognized in dealing with the relationships between federal and state courts still have weight. Where an injunction against a criminal proceeding is sought under § 1983, "the principles of equity, comity, and federalism" must nonetheless restrain a federal court. 407 U. S., at 243.

But even where the prayer for injunctive relief does not seek to enjoin the state criminal proceedings themselves, we have held that the principles of equity nonetheless militate heavily against the grant of an injunction except in the most extraordinary circumstances. In *O'Shea* v. *Littleton, supra*, at 502, we held that "a major

continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of equitable restraint which this Court has recognized in the decisions previously noted." And the same principles of federalism may prevent the injunction by a federal court of a state civil proceeding once begun. *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592 (1975).

Thus the principles of federalism which play such an important part in governing the relationship between federal courts and state governments, though initially expounded and perhaps entitled to their greatest weight in cases where it was sought to enjoin a criminal prosecution in progress, have not been limited either to that situation or indeed to a criminal proceeding itself. We think these principles likewise have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments such as petitioners here. Indeed, in the recent case of *Mayor* v. *Educational Equality League,* 415 U. S. 605 (1974), in which private individuals sought injunctive relief against the Mayor of Philadelphia, we expressly noted the existence of such considerations, saying: "There are also delicate issues of federal-state relationships underlying this case." *Id.,* at 615.

Contrary to the District Court's flat pronouncement that a federal court's legal power to "supervise the functioning of the police department . . . is firmly established," it is the foregoing cases and principles that must govern consideration of the type of injunctive relief granted here. When it injected itself by injunctive decree into the internal disciplinary affairs of this state agency, the District Court departed from these precepts.

For the foregoing reasons the judgment of the Court

of Appeals which affirmed the decree of the District Court is

*Reversed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

To be sure, federal-court intervention in the daily operation of a large city's police department, as the Court intimates, is undesirable and to be avoided if at all possible. The Court appropriately observes, however, *ante,* at 367, that what the Federal District Court did here was to engage in a careful and conscientious resolution of often sharply conflicting testimony and to make detailed findings of fact, now accepted by both sides, that attack the problem that is the subject of the respondents' complaint. The remedy was one evolved with the defendant officials' assent, reluctant though that assent may have been, and it was one that the police department concededly could live with. Indeed, the District Court, in its memorandum of December 18, 1973, stated that "the resolution of all the disputed items was more nearly in accord with the defendants' position than with the plaintiffs' position," and that the relief contemplated by the earlier orders of March 14, 1973, see *COPPAR* v. *Rizzo,* 357 F. Supp. 1289 (ED Pa.), "did not go beyond what the defendants had always been willing to accept." App. 190a. No one, not even this Court's majority, disputes the apparent efficacy of the relief or the fact that it effectuated a betterment in the system and should serve to lessen the number of instances of deprival of constitutional rights of members of the respondent classes. What is worrisome to the Court is abstract principle, and, of course, the Court has a right

to be concerned with abstract principle that, when extended to the limits of logic, may produce untoward results in other circumstances on a future day. See *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 355 (1908) (Holmes, J.).

But the District Court here, with detailed, careful, and sympathetic findings, ascertained the existence of violations of citizens' *constitutional* rights, of a *pattern* of that type of activity, of its likely continuance and recurrence, and of an official indifference as to doing anything about it. The case, accordingly, plainly fits the mold of *Allee* v. *Medrano,* 416 U. S. 802 (1974), and *Hague* v. *CIO,* 307 U. S. 496 (1939), despite the observation, 357 F. Supp., at 1319, that the evidence "does not establish the existence of any overall Police Department *policy* to violate the legal and constitutional rights of citizens, nor to discriminate on the basis of race" (emphasis supplied). I am not persuaded that the Court's attempt to distinguish those cases from this one is at all successful. There must be federal relief available against persistent deprival of federal constitutional rights even by (or, perhaps I should say, particularly by) constituted authority on the state side.

The Court entertains "serious doubts," *ante,* at 371–372, as to whether there is a case or controversy here, citing *O'Shea* v. *Littleton,* 414 U. S. 488 (1974). *O'Shea,* however, presented quite different facts. There, the plaintiff-respondents had alleged a fear of injury from actions that would be subsequent to some future, valid arrest. The Court said:

> "We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners . . . . Under these circumstances, where

respondents do not claim any constitutional right to engage in conduct proscribed by therefore presumably permissible state laws, or indicate that it is otherwise their intention to so conduct themselves, the threat of injury from the alleged course of conduct they attack is simply too remote to satisfy the case-or-controversy requirement and permit adjudication by a federal court." *Id.*, at 497–498.

Here, by contrast, plaintiff-respondents are persons injured by past unconstitutional conduct (an allegation not made in the *O'Shea* complaint) and fear injury at the hands of the police regardless of whether they have violated a valid law.

To the extent that Part II–A of the Court's opinion today indicates that some constitutional violations might be spread so extremely thin as to prevent any individual from showing the requisite case or controversy, I must agree. I do not agree, however, with the Court's substitution of its judgment for that of the District Court on what the evidence here shows. The Court states that what was shown was minimal, involving only a few incidents out of thousands of arrests in a city of several million population. Small as the ratio of incidents to arrests may be, the District Court nevertheless found a pattern of operation, even if no policy, and one sufficiently significant that the violations "cannot be dismissed as rare, isolated instances." 357 F. Supp., at 1319. Nothing the Court has said demonstrates for me that there is no justification for that finding on this record. The Court's criticism about numbers would be just as forceful, or would miss the mark just as much, with 100 incidents or 500 or even 3,000, when compared with the overall number of arrests made in the city of Philadelphia. The pattern line will appear somewhere. The District Court drew it this side of the number of

proved instances. One properly may wonder how many more instances actually existed but were unproved because of the pressure of time upon the trial court, or because of reluctant witnesses, or because of inherent fear to question constituted authority in any degree, or because of a despairing belief, unfounded though it may be, that nothing can be done about it anyway and that it is not worth the effort. That it was worth the effort is convincingly demonstrated by the result in the District Court, by the affirmance, on the issues before us, by a unanimous panel of the Third Circuit, and by the support given the result below by the Commonwealth of Pennsylvania, the Philadelphia Bar Association, the Greater Philadelphia Movement, and the other entities that have filed briefs as *amici curiae* here in support of the respondents.

The Court today appears to assert that a state official is not subject to the strictures of 42 U. S. C. § 1983 unless he directs the deprivation of constitutional rights. *Ante,* at 375–377. In so holding, it seems to me, the Court ignores both the language of § 1983 and the case law interpreting that language. Section 1983 provides a cause of action where a person acting under color of state law "subjects, or causes to be subjected," any other person to a deprivation of rights secured by the Constitution and laws of the United States. By its very words, § 1983 reaches not only the acts of an official, but also the acts of subordinates for whom he is responsible. In *Monroe* v. *Pape,* 365 U. S. 167 (1961), the Court said that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions," *id.,* at 187, and:

"It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, pas-

sion, *neglect,* intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by state agencies." *Id.,* at 180. (Emphasis added.)

I do not find it necessary to reach the question under what circumstances failure to supervise will justify an award of money damages, or whether an injunction is authorized where the superior has no consciousness of the wrongs being perpetrated by his subordinates.[1] It is clear that an official may be enjoined from consciously permitting his subordinates, in the course of their duties, to violate the constitutional rights of persons with whom they deal. In rejecting the concept that the official may be responsible under § 1983, the Court today casts aside reasoned conclusions to the contrary reached by the Courts of Appeals of 10 Circuits.[2]

---

[1] In this regard, however, this Court recently has approved the imposition of criminal liability without "consciousness of wrongdoing" for failure to supervise subordinates. *United States* v. *Park,* 421 U. S. 658 (1975). The concept, thus, is far from novel doctrine.

[2] "Under section 1983, equitable relief is appropriate in a situation where governmental officials have notice of the unconstitutional conduct of their subordinates and fail to prevent a recurrence of such misconduct. *Hague* v. *CIO,* 307 U. S. 496 . . . (1939). From a legal standpoint, it makes no difference whether the plaintiffs' constitutional rights are violated as a result of police behavior which is the product of the active encouragement and direction of their superiors or as a result of the superiors' mere acquiescence in such behavior. In either situation, if the police officials had a duty, as they admittedly had here, to prevent the officers under their direction from committing the acts which are alleged to have occurred during the Convention, they are proper defendants in this action." *Schnell* v. *City of Chicago,* 407 F. 2d 1084, 1086 (CA7 1969). See also *Inmates of Suffolk County Jail* v. *Eisenstadt,* 494 F. 2d 1196, 1199 (CA1), cert. denied, 419

In the instant case, the District Court found that although there was no departmental policy of racial discrimination, "such violations do occur, with such frequency that they cannot be dismissed as rare, isolated instances; and that little or nothing is done by the city authorities to punish such infractions, or to prevent their recurrence," 357 F. Supp., at 1319, and that it "is the policy of the department to discourage the filing of such complaints, to avoid or minimize the consequences of proven police misconduct, and to resist disclosure of the final disposition of such complaints." *Id.*, at 1318. Needless to say, petitioners were under a statutory duty to supervise their subordinates. See Philadelphia Home Rule Charter, c. 2, § 5–200. I agree with the District Court that its findings are sufficient to bring petitioners within the ambit of § 1983.

Further, the applicability of § 1983 to controlling officers allows the district courts to avoid the necessity of injunctions issued against individual officers and the consequent continuing supervision by the federal courts of the day-to-day activities of the men on the street. The District Court aptly stated:

"Respect and admiration for the performance of the vast majority of police officers cannot justify refusal to confront the reality of the abuses which

---

U. S. 977 (1974), and *Rozecki* v. *Gaughan,* 459 F. 2d 6, 8 (CA1 1972); *Wright* v. *McMann,* 460 F. 2d 126, 134–135 (CA2), cert. denied, 409 U. S. 885 (1972); *Lewis* v. *Kugler,* 446 F. 2d 1343, 1351 (CA3 1971); *Lankford* v. *Gelston,* 364 F. 2d 197 (CA4 1966); *Jennings* v. *Patterson,* 460 F. 2d 1021, 1022 (CA5 1972); *Smith* v. *Ross,* 482 F. 2d 33, 36 (CA6 1973); *Byrd* v. *Brishke,* 466 F. 2d 6, 10–11 (CA7 1972); *Jennings* v. *Davis,* 476 F. 2d 1271, 1275 (CA8 1973); *Dewell* v. *Lawson,* 489 F. 2d 877, 881 (CA10 1974); *Carter* v. *Carlson,* 144 U. S. App. D. C. 388, 395, 447 F. 2d 358, 365 (1971), rev'd on other grounds *sub nom. District of Columbia* v. *Carter,* 409 U. S. 418 (1973).

> do exist. But deference to the essential role of the police in our society does mandate that intrusion by the courts into this sensitive area should be limited, and should be directed toward insuring that the police themselves are encouraged to remedy the situation." 357 F. Supp., at 1320.

I would regard what was accomplished in this case as one of those rightly rare but nevertheless justified instances—just as *Allee* and *Hague*—of federal-court "intervention" in a state or municipal executive area. The facts, the deprival of constitutional rights, and the pattern are all proved in sufficient degree. And the remedy is carefully delineated, worked out within the administrative structure rather than superimposed by edict upon it, and essentially, and concededly, "livable." In the City of Brotherly Love—or in any other American city—no less should be expected. It is a matter of regret that the Court sees fit to nullify what so meticulously and thoughtfully has been evolved to satisfy an existing need relating to constitutional rights that we cherish and hold dear.