Charles R. TAYLOR, Sr., et al., Plaintiffs,

v.

CANTON, OHIO POLICE DEPT., et al., Defendants.

Civ. A. No. C 80–1469 A.

United States District Court, N. D. Ohio, E. D.

Aug. 11, 1982.

Steven M. Fitten, Dayton, Ohio, for plaintiffs.

William J. Hamann, Chief Counsel, Canton, Ohio, for defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This civil rights action was brought by plaintiffs Charles Taylor, Sr., and his wife, Janet E. Taylor, against the City of Canton, Ohio, its officials, and Sheldon L. Gotschall, a police officer employed by the City, for injuries Taylor sustained as a result of being struck over the head with a billy club by Gotschall. The Taylors allege violations of the Fourth, Fifth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution, as well as violations of 42 U.S.C. §§ 1981, 1983, 1985, and 1986. Mrs. Taylor also asserts pendent state law claims. Named as defendants are the Canton, Ohio Police Department (the Department), the City of Canton, Ohio (the City), Mayor Stanley Cmich, Safety Director Frank Burnosky, former Chief of Police David Maser, and Patrolman Sheldon Gotschall.

Although initially brought as a class action, plaintiffs withdrew their Motion for Class Certification on September 29, 1981, and the case proceeded to trial before this Court on the Taylors' individual claims. Upon consideration of all the evidence adduced at trial, the Court finds that judgment should be entered in favor of plaintiff Charles Taylor, Sr., on his claims against defendant Gotschall. Judgment should be entered in favor of the City defendants on each of Taylor's claims; and judgment should be entered in favor of all defendants on Mrs. Taylor's claims. Further, the Court finds that on the facts of this case, no issues are raised under the Fourth, Fifth, Eighth, and Thirteenth Amendments to the Constitution, nor under 42 U.S.C. §§ 1981, 1985 and 1986. Consequently, those claims are hereby dismissed.

I

The undisputed facts show that on February 8, 1980 a basketball game was played at

the Canton Memorial Fieldhouse, which is owned and operated by the Canton Board of Education. Security for this basketball game was provided by uniformed members of the Canton Police Department, as it has been for at least the past twelve years. All of the police officers working at the game, including defendant Gotschall, were white; 99% of the spectators were black. These officers, who were purportedly off duty, were paid by the Canton Board of Education, out of its Athletic Fund. However, the Canton Police Department selected the officers from its overtime list, with no input from the Board of Education and with preference being given to officers who worked a day shift. In addition, Police Department regulations required a supervisory officer to be present whenever there were more than six officers working off duty. Consequently, on February 8, 1981, Captain David Reese was also working at the Fieldhouse, in a supervisory capacity.

It is also undisputed that plaintiff Charles Taylor was struck on the back of the head with a billy club by defendant Gotschall, as Taylor was exiting the building after the basketball game. When Gotschall hit Taylor, the club broke upon impact; Taylor turned around, saw Gotschall, and took a step toward him. Gotschall then pulled his gun, and was restrained by George Kennedy, a Canton Municipal Court Assistant Bailiff. There is a sharp dispute, however, regarding the circumstances under which this incident occurred. Gotschall contends that at the time of this incident, a riotous situation existed as a result of Captain Reese, Kennedy, and two or three others officers arresting a black youth, by the name of Turner, who had been involved in a scuffle with police officers on the basketball court during the final two minutes of the game. He claims that the crowd exiting the building was hostile to the police, yelling obscenities, and threatening to take their guns. It was at this point Gotschall contends he saw Taylor strike Captain Reese over the head. Consequently, Gotschall struck Taylor with his billy club allegedly in order to effect the arrest of Taylor.

The Court notes that during the last two minutes of the game, a tense situation developed between some of the spectators and the police officers, who had positioned themselves at the four corners of the basketball court, to prevent those in attendance from trekking across the floor when the game ended. Two officers were situated so that they could escort the referees off the court. Turner attempted to walk across the basketball court and was stopped by Officer King, who grabbed Turner's shoulder as if to effect an arrest. A struggle ensued, and one entire section of the bleacher area, which contained predominantly black youths, poured onto the basketball court. Some of the parents and other black adults who were present assisted the police in getting the youths off the court, and George Kennedy, who also is black, even assisted in the apprehension and arrest of Turner. Whatever commotion or tension that existed apparently was brought under control within a brief period of time, because not only did the basketball game continue to the finish, but at least four of the six or seven police officers who were working left the game area and proceeded to the upper level of the Fieldhouse (where the exit doors are located) to assist in the arrest of Turner.

Upon seeing the commotion, defendant Gotschall testified that he started to make his way through the crowd to assist King by wedging a path with his billy club held sideways. Because of the size of the crowd he was unable to reach King but did see King and two or three other officers taking Turner out of the playing area and heading upstairs toward the exit doors. Gotschall then attempted to follow these officers. By the time he reached the upper level the game was over and the crowd was leaving. It was at this point that Gotschall saw Taylor, who was proceeding toward the exit doors with Ronnie Harris, (who was carrying his three-year-old daughter in his arms); it was also at this point that Gotschall claims he saw Taylor strike Reese across the head with his fist. Gotschall then came up behind Taylor and hit him across the head with his billy club.

Taylor denies having struck Reese or anyone else. He testified that he left his seat and went onto the floor area to find his son after the commotion started. When he did not see his son on the floor, he proceeded to the upper level. By this time the game had ended and the crowd had begun to leave; Taylor came upon Ronnie Harris, and the two of them proceeded toward the exit doors. Taylor testified he saw the police officers rush past with Turner, then he felt a "sting" on his head. He turned around and there stood Gotschall who pulled his revolver when Taylor took a step toward him.

Taylor's testimony was corroborated by Ronnie Harris, who also saw the officers taking Turner outside. However, unlike Taylor, Harris actually saw Gotschall run up behind Taylor and rap him over the head with the club. Harris, who was standing right next to Taylor, testified that Taylor did not strike Reese; and that only after Gotschall struck Taylor did the crowd in the area become "rowdy".

George Kennedy did not see Gotschall strike Taylor; nor did he even see Taylor. He did, however, arrive on the scene just in time to restrain Gotschall as he was backing up with his revolver outside the holster.

Several police officers testified to varying versions of the events of the evening; most of them taking credit for assisting in the arrest of Turner. Officer King, who had two fractured teeth as a result of the scuffle with Turner, testified that he saw Taylor hit Reese. As a result, he claims, two officers pulled their guns to back off the crowd. He could not recall whether Gotschall pulled his gun, and King made no attempt to arrest Taylor. Officer Haft did not see Taylor hit Reese, but he claims that at some point Taylor poked Haft in the chest. He did not see any reason, however, to write Taylor up for that incident. Officer Crider claims that Taylor pushed him at the foot of the steps; however, he later admitted he was not sure it was Taylor since he was identifying him by size alone. Officer Bowling testified he saw Taylor hit Reese but did not arrest Taylor because the crowd was hostile and he wanted to get out of the area. Captain Reese testified he was struck from behind as he was taking Turner outside, but he did not know who did it, and he was not hurt. Whatever the case, Taylor was never arrested, nor was he ever charged with the alleged offense of striking Reese.

## II

Taylor contends that Gotschall, acting under color of state law, struck him without provocation, justification, or probable cause, and that Gotschall's actions were precipitated solely by the fact that Taylor is black, in violation of 42 U.S.C. § 1983. Gotschall, on the other hand, contends that he is entitled to conditional immunity because he acted in the good faith belief that the force used by him was reasonable and necessary to effect the arrest of Taylor. The additional contention is made that at the time of this incident Gotschall was off duty from his regular employment with the Department, and was employed as an independent contractor by the Board of Education.

■ It is well established that the fact that Gotschall may have been off duty at the time this incident occurred is irrelevant to a determination whether he was acting under color of state law. See *Stengel v. Belcher*, 522 F.2d 438 (6th Cir. 1975), and *Layne v. Sampley*, 627 F.2d 12 (6th Cir. 1980). " 'It is the nature of the act performed, not ... the status of being on duty, or off duty, which determines whether the officer has acted under color of law.' " *Stengel v. Belcher, supra* at 441, *citing Johnson v. Hackett*, 284 F.Supp. 933, 937 (E.D.Pa.1968). Gotschall was working at the Canton Memorial Fieldhouse on February 8, 1980, as a result of having signed up for the job on an overtime list at the Police Department. He was wearing his uniform, carrying his gun, and was performing the same official functions he would have performed during his normal working hours. Moreover, he was under the supervision of a captain of the Police Department. Accordingly, this Court has no difficulty in finding that Gotschall was

acting under color and authority of state law.

■ As to Gotschall's "good faith" defense, his testimony and that of the other officers who claim to have seen Taylor strike Reese, severely tax the Court's credulity. This Court simply does not believe that three police officers, who actually saw Taylor strike a fellow officer, would fail to arrest or even charge Taylor with the offense. The testimony by Gotschall and Captain Reese with regard to the failure to charge Taylor is no more credible. Gotschall claims that he went to the prosecutor's office to file a complaint against Taylor; however, the prosecutor refused to take the complaint because Reese, not Gotschall, was the person who was hit by Taylor. Reese claims that he later went to the Prosecutor's Office but his complaint was refused because Gotschall, who allegedly saw the incident, was not with Reese at the time of Reese's complaint.

■ The Court finds that Taylor did not strike Reese, or any other officer, at the Fieldhouse on February 8, 1980. Further, the Court finds that Gotschall is not entitled to conditional immunity. The Court cannot find that Gotschall acted in a "good faith" belief that it was necessary to use force to effect Taylor's arrest, when neither Gotschall nor anyone else ever even attempted to arrest Taylor. Rather, Gotschall's actions were totally without provocation, justification, or probable cause, and they constitute an infringement by him of Taylor's constitutional rights in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

### III

Taylor contends that the City of Canton, its police department, and the defendant city officials are also liable to him for constitutional violations he sustained as a result of Gotschall's actions. The majority of Taylor's allegations against these defendants are that they placed improperly and insufficiently trained police officers on the streets of Canton, who negligently, intentionally, recklessly, willfully and wantonly deprived him of his constitutional rights, and who were permitted to use the power of arrest to inflict serious physical injury on the citizens of Canton.

■ While *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) authorizes suits against municipalities under § 1983, it is clear that a municipality cannot be held liable solely on a *respondeat superior* theory. Rather, the alleged unconstitutional action must implement or execute a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the municipality's officers; or the "constitutional deprivations [must be] visited pursuant to a governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. at 690–91, 98 S.Ct. at 2035–2036. Taylor's allegations fail to specify a policy or custom on the part of the city or its officials that caused the constitutional violations complained of. Rather, they merely amount to another way of stating that the city is liable because it hired a tortfeasor. Therefore, they fail to state a § 1983 cause of action. The same result obtains in Taylor's claim of a direct action under the Constitution. See *Jones v. City of Memphis*, 586 F.2d 622 (6th Cir. 1978).

### IV

### (A)

Taylor also makes claims of negligent, intentional, willful and wanton hiring of police officers by the city defendants. Further, he makes the specific claims that defendant Maser, during his term, failed to manage, train, supervise and review, and discipline police officers. Moreover, he claims that defendant Burnosky failed to initiate investigations into complaints of police misconduct and civil rights violations, and failed to periodically evaluate and update, to assure that members of the police force had adequate training, working knowledge, and continuing education in the rules, regulations, law and judicial decisions

regarding criminal procedure, arrests and the use of force. These claims are also essentially those of negligence. That is, Taylor is claiming that the proximate cause of his injuries was the inaction of the city defendants.

█ It is well settled that mere inaction by supervisory officials will not suffice to support a § 1983 claim. Indeed, the Sixth Circuit Court of Appeals recently held, in *Hays v. Jefferson County*, 668 F.2d 869 (6th Cir. 1982), that "simple negligence is insufficient to support liability of high police officials and municipalities for inadequate training, supervision, and control of individual officers". This is so because *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), cited by the Supreme Court in *Monell*, and by the Sixth Circuit in *Hays*, requires the existence of an "affirmative link" or "causal connection" between an individual police officer's misconduct and the adoption of any plan or policy by the municipality—express or otherwise—showing their authorization or approval of such misconduct. *Rizzo, supra* at 371, 96 S.Ct. at 604. In other words, a plaintiff must prove that the action or failure to act by city officials was in some way deliberate rather than inadvertent. See *Hays, supra* at 873.

█ The only evidence introduced at trial regarding any hiring by defendants was related to the hiring of defendant Gotschall who Taylor contends should never have been hired by the Department. An internal memo to Chief Maser from an officer who investigated Gotschall prior to his being hired revealed that a clergyman Gotschall used as a character reference could not recommend him because he did not know Gotschall "that well"; and that some of Gotschall's neighbors would not recommend him because of some problems they had had with his brothers. As a result, the investigator felt that Gotschall would not be a good prospect for patrolman with the Department. The Court finds this evidence to be totally insufficient to support Taylor's claims of negligent, willful or wanton hiring of Gotschall or any other police officers. It appears that the investigator made an adequate check into Gotschall's background, and there was no indication of any incidents or other evidence tending to show a propensity for violence or anything else that would warrant further investigation prior to hiring Gotschall. While the fact that a character reference or neighborhood check did not provide the Department with favorable recommendations, they also failed to reveal unfavorable information on which a determination not to hire could have been made. The most that would have been required would have been for the Department to require Gotschall to supply additional references. However, this Court is of the opinion that the importance to be placed on this aspect of the employment process was certainly within the sound discretion of the police chief. Therefore, the Court concludes that the evidence simply does not show any hiring policy by the city or its officials which may be deemed negligent, willful or wanton or which, by any stretch of the imagination, might be connected with the incident which is the subject of this lawsuit.

(B)

█ In determining the adequacy of the training provided police officers, this Court adopts the standard enunciated by Senior Judge Thomas of this Court in *Edmonds v. Dillin*, 485 F.Supp. 722 (N.D.Ohio 1980):

> If a municipality completely fails to train its police force, or trains its officers in a manner that is in reckless disregard of the need to inform and instruct police officers to perform their duties in conformity with the Constitution, and if the municipality might reasonably foresee that unconstitutional actions of its police officers might be committed by reason of the municipality's failure or reckless disregard, then the municipality would have implicitly authorized or acquiesced in such future unconstitutional acts.

485 F.Supp. at 727. Evidence adduced at trial, through the testimony of defendant Maser, present Chief Wyatt, and several police officers, reveals that all officers receive the basic training course in laws and

procedure, evidence, and weapon use at the Police Academy. They also receive training in riot control and instruction in crowd control. There is a course in community relations offered, but none in race relations. There does not appear to be any continuing training program offered in any area, including the rules and regulations of the department. As to the updating and training in the rules and regulations, Chief Wyatt testified that there is a rule requiring officers to familiarize themselves with laws; however, this rule can only be enforced through testing, and the department does not conduct tests.

Additionally, the minutes from the August 4, 1980 City Council Meeting (Pl.Ex.54) reveal that Mayor Cmich was aware of the possible inadequacy of the rules, and had requested the City Solicitor's Office to provide a full-time lawyer to assist the police department in revising rules and regulations that had become outdated by new state and federal laws, and by Supreme Court law enforcement rulings. There was no evidence presented to show the extent of the mayor's knowledge of this situation prior to the incident in this case. According to Gotschall, the rule with regard to the use of force is that an officer should use as much force as is necessary to effect an arrest; and the rules for effecting arrests are read to the officers each day at roll call.

The only evidence with regard to the training police officers receive in the use of the "billy club" or "nightstick" is that they are trained to use these weapons in crowd control-type situations—*i.e.*, in working their way through crowds. Although the wooden club with which Gotschall struck Taylor was outdated at the time, and was not regulation or standard issue, the Department did not prohibit its use. After the incident here, the wooden club was banned and the Department instituted a requirement that officers use the regulation fiberglass nightstick (Def.Ex. 18), which is approximately twenty-four inches long, and has a metal rod through the center. It is unclear whether the wooden "billy club" was issued to Gotschall by the Department, or whether any specific training was required for the use of the regulation nightstick. While the possibility that an officer might strike someone with a nightstick or "billy club" is an occurrence which might reasonably have been foreseen by the defendants, this Court is of the opinion that no amount of training in the use thereof would have made a significant difference in the predictability of Gotschall's behavior. As to the significance of the use (or even the issuance, if that is the case) of a nonregulation club, it appears to the Court, as a practical matter, that the only difference that would have obtained had Gotschall used a regulation club is that it probably would not have broken when it impacted with Taylor's head.

■ Evidence adduced in this case demonstrates that the training provided its police force by the Canton Police Department leaves much to be desired; however, on the evidence before it, this Court cannot find that the training received by Canton police officers with respect to the weapon used in this case, or with respect to the use of force, is so grossly inadequate as to satisfy the standard of *Dillin*.

### (C)

Finally, we turn to the claim of the defendant's failure to supervise, review, and discipline police officers, and the failure to initiate investigations into complaints of police misconduct. Taylor contends that the procedures used by the defendants, which amount to inaction by them, have resulted in an official policy or custom which authorizes or acquiesces in constitutional deprivations, and which has directly contributed to lawlessness and disorganization within the Department.

As to the claim of failure to investigate complaints of police misconduct, present Chief Wyatt testified to the complaint procedure. The majority of complaints received by the Department are from persons who are arrested or injured, and they deal with police officers in the field. Generally, complaints go through a chain of command, beginning with a commanding officer, and

continuing up to an officer with the rank of major. Investigations are conducted by the captains or their assistants; however, the major has the ultimate decision as to which complaints will be investigated and how far a particular complaint will be pursued. Because the Department has no internal affairs division, complaints against police officers are treated as any other complaints—if the investigation reveals that action need be taken on a particular complaint against a police officer, the prosecutor's office is requested to pursue it. Consequently, it appears that the only way Canton's police officers accused of misconduct are disciplined is through the prosecutor's office.

The disciplinary procedure within the Department begins with an oral and/or written reprimand. The Chief has the authority to suspend an officer pending a hearing before Safety Director Burnosky, at which time Burnosky decides whether to suspend or fire the officer. No police officer has ever been fired. There have been three officers seriously disciplined since January 1, 1975. One of those officers received a thirty-day suspension, in May 1975, for an assault; another received a six-month suspension, in February 1978, for vandalism of police equipment,[1] and resigned in March 1979, after having been indicted, tried, and found not guilty of aggravated robbery. The third officer resigned in September, 1980 after a charge of tampering with evidence. Both of the officers who resigned did so on their own, with no request or demand for their resignation by police officials.

Defendant Gotschall's disciplinary history, prior to the incident in this case, shows that on October 5, 1978, he was involved in an accident with a police cruiser he was using while working for a private contractor (See P.Exs. 13&20). No disciplinary action was taken, and it does not appear that either defendants Maser or Burnosky were aware of the incident. On November 15, 1979, Gotschall was "admonished" by Cap-

tain Fetterman for using coarse language while reprimanding two youths who were swinging in a tree on public property. That incident was investigated and reported to defendants Maser and Burnosky by Fetterman after the mother of one of the youths complained (P.Ex.17).

The only evidence introduced by Taylor in support of his contention that Gotschall had a propensity for violence or use of improper force prior to the incident here, was that of an incident in February, 1977. The Stark County Sheriff's Department had responded to a 1:00 a. m. call from Gotschall's girlfriend who had broken up with him, and who reported that Gotschall had threatened to damage her house and do her bodily harm. Upon arriving at the girlfriend's residence, the deputies found Gotschall in the driveway with a .357 magnum in his trousers. He left the property when asked to do so by the deputies (See P.Ex. 52). On March 8, 1977, defendant Maser sent a written reprimand to Gotschall (P.Ex.10) for violating departmental rules regarding deportment, and for failure to inform his superiors of the incident. Although Chief Maser deemed this to be a serious matter, no other action was taken against Gotschall, and no supervisory official ever discussed the matter with him. In addition, no investigation was made into Gotschall's psychiatric history, nor was any examination conducted to determine his mental state immediately after the incident. One year later, in April, 1978, Gotschall checked himself into Altman Hospital's Psychiatric Ward where he was treated for depression. The hospital records reveal that Gotschall was still distressed because of his girlfriend's repeated attempts to break up with him, and he admitted to having slapped her around a few times over the years. After his release from the hospital, Maser required Gotschall to be examined by the City's psychiatrist prior to returning to duty. Once he was cleared (Def. Ex.5), Gotschall was permitted to return to work.

---

1. This action was apparently taken by the Civil Service Commission; all others were taken by defendant Burnosky. See Def.Ex.1.

After the incident in this case (March 16, 1980), Gotschall was involved in an incident in which he used force while assisting in the arrest of a citizen (P.Ex.14). Despite the fact that this occurrence took place only one month after the Taylor incident, no investigation was made by the Department. The only other evidence of Gotschall's disciplinary record after February 1980 is contained in plaintiff's Exhibits 11 and 12 which have to do with Gotschall's being reprimanded because of his tardiness and/or being AWOL on four different occasions over a twelve-month period. Gotschall was never disciplined for striking Taylor on February 8, 1980; nor does it appear that any investigation was ever conducted.

A municipal policy of authorizing or encouraging police misconduct can be inferred when city officials persistently fail to discipline police officers for known unconstitutional conduct. *Herrera v. Valentine*, 653 F.2d 1220 at 1224 (8th Cir. 1981); *Turpin v. Mailet*, 619 F.2d 196 at 201 (2d Cir. 1980); *Popow v. City of Margate*, 476 F.Supp. 1237 at 1246 (D.N.J.1979). However, no policy can be inferred from isolated decisions not to discipline single officers for single incidents of illegality. *Berry v. McLemore*, 670 F.2d 30 (5th Cir. 1982); *Landrigan v. City of Warwick*, 628 F.2d 736 at 747 (1st Cir. 1980). There was simply no evidence presented in this case that the city

officials had knowledge of any widespread police abuse or use of excessive force, prior to the incident in this case,[2] sufficient to warrant a finding that this type of misconduct is "so customary as to indicate the existence of an unarticulated municipal policy authorizing or encouraging" such misconduct. See *Berry v. McLemore, supra* at 32. Nor was there any evidence of any persistent failure to discipline Gotschall or any other police officers for misconduct prior or to the incident in this case.

One disturbing aspect of this case is the Department's procedure of referring complaints of police misconduct to the prosecutor's office for investigation. The prosecutor is assessing conduct in terms of whether it is criminally actionable under state law. If it is not, then no criminal proceedings will be instituted and the investigation ends. However, while an officer's conduct may not be criminally actionable, it could well cause a constitutional deprivation which would at the very least require some less stringent, yet punitive, administrative action.[3] See *Popow v. City of Margate, supra.* Procedures such as this certainly are inadequate for maintaining proper standards within the Department, for they conceivably could give police officers the notion that so long as they stay within the boundaries of the criminal law, they will suffer no adverse consequences for any constitutional

2. Taylor submitted evidence of an NAACP Resolution, which also was printed in a Canton newspaper, detailing specific instances of police abuse, and calling for an end to police brutality (See P.Ex.58). In addition, Ron Ponder, President of the Canton Chapter of the NAACP, testified that he spoke to members of the Canton City Council on several occasions, and at least the Mayor and Safety Director were present at those sessions. However, all of the above occurred *after* the incident in question. In addition, selected minutes of council meetings show that the majority of Ponder's remarks to council had to do with racially discriminatory hiring practices within the police and fire departments. (See P.Exs. 54–57). Despite all this, neither the Resolution nor Ponder's remarks to council evidence the kind of systematic, municipally-supported abuse or misconduct within the contemplation of *Monell* and its progeny.

3. See *e.g.*, P.Ex.2, which is a letter, dated April 27, 1978, from the Law Director to Ron Harris, informing him that the City Prosecutor had been instructed to contact defendant Maser to investigate alleged mistreatment Harris' mother and sister suffered at the hands of the police when his mother was arrested for a traffic violation. Harris testified in this case that he had complained to the police department but there was no investigation. He then complained to the Law Director's office. Harris was subsequently notified that an investigation had taken place; however, neither Harris, his mother, nor his sister was ever summoned to supply any evidence to the investigators. No action was ever taken against any police officer.

deprivations they might perpetrate.[4]  However, the Court cannot find, on the evidence before it, that these procedures were so grossly inadequate and Gotschall's conduct so probable as a result, that the city can fairly be considered to have tacitly encouraged or acquiesced in such conduct.

Therefore, the Court finds that Gotschall's unconstitutional action in striking Taylor was not taken pursuant to any policy or custom of the City of Canton.  Accordingly, the City is not liable to Taylor for the constitutional deprivations he suffered.

## V

The relief requested by Taylor includes a declaratory judgment; permanent injunctive relief, compensatory and punitive damages; and attorney's fees and costs.  Because the Court has found no liability on the part of any of the City defendants, Taylor's request for declaratory and injunctive relief is denied.

### A.  Compensatory Damages

The basic purpose of a § 1983 damages award is to compensate persons for injuries that are caused by the deprivation of constitutional rights.  *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

Taylor claims that as a result of his injuries, he has incurred expert medical expenses, including hospital care; and that he has endured extreme pain and suffering.  He also makes a claim for lost wages.  The evidence shows that shortly after the incident occurred Taylor was treated in the Emergency Room at Timken Mercy Medical Center, and was released a short time thereafter.  (See P.Ex.8).  Aside from his testimony that his family doctor gave him a prescription, there was no evidence that Taylor received any follow-up treatment for his head injury.  Taylor also testified that he suffered headaches for about three weeks after the incident, and that a pre-existing eye condition has worsened as a result of the blow to his head.  There was no medical evidence presented, either by expert testimony or by way of medical records, to support Taylor's claim of a worsened eye condition.

Although Taylor alleges that he lost wages as a result of his injury, he admitted that he never filed a claim for any lost wages.  Moreover, the evidence shows that Taylor suffered a heart attack in August, 1979, and was still on sick leave at the time this incident occurred in February 1980.  He returned to work in mid-March, 1980.  There was no evidence presented to show that Taylor would have, or could have, returned to work sooner had it not been for his head injury.

Therefore, the Court finds that Taylor's out-of-pocket expenses as a direct result of Gotschall's striking him is $69.35, which represents the costs of his Emergency Room treatment.  Further the Court finds that Taylor did endure pain and suffering as a direct result of Gotschall's action.  Gotschall is liable to Taylor in the amount of $569.35 plus attorney's fees and costs, for this infringement of Taylor's constitutional rights.

### B.  Janet Taylor's Claims

Mrs. Taylor's claims for loss of services, society, and companionship are not supported by the evidence.  She testified that Taylor's disposition had changed since his injury, and that she has been inconvenienced by having to keep him by her all the time.  This Court is of the opinion that any loss of services or companionship is due more to Taylor's heart condition than to his head injury.  If Taylor had been home since his heart attack in August, 1979, it is unlikely that his head injury caused much additional inconvenience to Mrs. Taylor.  Therefore, the Court finds that plaintiff Janet Taylor is not entitled to any award of damages from any defendants.

---

**4.** It is interesting to note that no police officer has ever been fired in the history of the Canton Police Department.  It is even more interesting that (according to present Chief Wyatt) there has not been a case of use of excessive force in the Department in twenty-four years.

*C. Punitive Damages*

In order to recover punitive damages under § 1983, the plaintiff must show by a preponderance of the evidence that the defendant acted with a wanton and malicious disregard for the plaintiff's constitutional rights. Taylor has sustained this burden. The evidence clearly shows that aside from the commotion created by the police officers removing Turner from the area, there was no riotous situation or hostile crowd in the area of the exit doors to the Fieldhouse. Taylor and Harris were peacefully proceeding with the crowd out of the building when Gotschall came up behind Taylor and struck him with the billy club. Gotschall's action was totally without provocation or justification, and he was not attempting to effect an arrest of Taylor. Therefore, the Court finds that Gotschall was acting in bad faith and with wanton disregard for Taylor's constitutional rights.

Punitive damages are imposed in § 1983 actions primarily for their effect on defendants and to vindicate the public interest in deterring malicious or wanton conduct by public officials. This Court concludes that the public interest would be served by an award of punitive damages against Sheldon Gotschall in this case. Accordingly, the Court finds Gotschall to be liable to Taylor for punitive damages in the amount of $1,500.

Having determined that plaintiff is entitled to an award of attorney's fees and costs, plaintiff's counsel is ordered to prepare and file with the Court documentation of the amount of attorney's fees within twenty (20) days of the date of this Order. Defendant may file any objections within ten (10) days thereafter.

IT IS SO ORDERED.