Floyd Leroy REEVES, Individually and as a member of the class of persons similarly situated, Plaintiff,

v.

Reginald EAVES, Individually and in his capacity as Commissioner of Public Safety, et al., Defendants,

Frank Roberts and the Fraternal Order of Police, Intervenors.

AFRO–AMERICAN PATROLMEN'S LEAGUE et al., Plaintiffs,

v.

Reginald EAVES, Individually and in his capacity as Commissioner of Public Safety, et al., Defendants,

John Zimmer et al., Intervenors.

Civ. A. Nos. 18191, 18227.

United States District Court,
N. D. Georgia,
Atlanta Division.

May 3, 1976.

David W. Crosland, Atlanta, Ga., for plaintiff in No. 18191.

Henry L. Bowden, Jr., John E. Dougherty, Atlanta, Ga., for all defendants in No. 18191.

Benjamin W. Spaulding, Spaulding, Montgomery & Associates, Atlanta, Ga., for plaintiffs in No. 18227.

Henry L. Bowden, Jr., John E. Dougherty, Atlanta, Ga., for City, Councilmen, etc.

Garland, Nuckolls & Kadish, Atlanta, Ga., for Frank Roberts and Fraternal Order of Police.

William A. McHugh, Jr., Adair, Goldthwaite, Stanford & Daniel, Atlanta, Ga., for Zimmer, Umphress, Lane, Sanders & Fulton County Police Benevolent Association.

## ORDER

MOYE, District Judge.

Defendants, City of Atlanta and A. Reginald Eaves, have appealed this Court's preliminary injunction order of March 11, 1976, and now, pursuant to Appellate Rule 8(a), move the district court for a stay of said preliminary injunction pending determination of said appeal. Appeals have also been filed by both groups of plaintiffs.

The defendants' request is hereby OVERRULED and DENIED.

However, in view of the "special delicacy of the adjustment to be preserved between federal equitable power and State administration . . . ,"[1] a proper concern for the defendant city's assertion that it will be hampered in its public functions by continuation of this Court's preliminary injunction requires that the Court articulate further its reasons for imposing the injunction in the first place, and now refusing to stay it.

---

1. *Stefanelli v. Minard,* 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951), quoted in *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, 44 U.S. L.W. 4095, 4100 (decided January 21, 1976).

This is a somewhat unusual case, at least in its present posture. It consists of two consolidated cases, filed in[4] 1973, both of which cases sought broad, class-action, injunctive relief as against the city police administration on behalf of black policemen, applicants for such position, etc., as well as specific reinstatement-back pay relief on behalf of several individual black policemen who had been disciplined and/or demoted. At that time the Mayor of Atlanta was white, as was the police chief, and the entire city administration was at least predominantly white. The Court, following a preliminary injunction hearing on July 2, 1973, granted individual relief to some complainants, denied it as to others, and did not at that time consider broad department-wide relief (Order dated October 18, 1973).

On January 3, 1974, a proposed pretrial order was filed by the parties stating, in part:

"(20) The parties request the Court to defer placing this case on the trial calendar in the immediate future for the following reasons. Discovery has not ended and the parties are actively involved in the discovery process (see item 6). Once discovery is completed they will require time to reconsider their respective positions in the light of all the available evidence, make whatever motions may seem appropriate in the evidence and take the necessary steps to enter into negotiations leading to a possible resolution of some or all of the outstanding issues in this action.

\* \* \* \* \* \*

"(24) There have not been specific settlement negotiations to date, however it is likely that settlement negotiations will commence subsequent to the implementation of the new charter of the City of Atlanta and the inauguration of the newly elected officials. [In December 1973, the Honorable Maynard Jackson, a black, was elected Mayor of Atlanta.]

"(25) Plaintiffs and Defendants both anticipate that the Department of Justice [named as defendant by plaintiff, Afro-American Patrolmen's League] may realign their position in this case, in which case this pretrial order would be moot and the entire complexion of the case would be changed. [And the record shows that subsequently the Department of Justice carried the load of discovery on behalf of plaintiffs.]

"Since filing this action, a city election has been held and the Mayor and members of the Board of Aldermen have changed. [The Board of Aldermen is now split equally between black and white members, the Court is informed.] Counsel anticipates that Plaintiffs may file an amendment as to the names of the individual members of the Board of Aldermen and the Mayor. It should be further noted that the Charter of the City of Atlanta has been revised since the filing of this lawsuit and will be implemented in January, 1974. The revisions of the Charter substantially change the powers of the parties Defendant, and some issues might be resolved without the necessity of being tried."

There the matter rested until November 11, 1975, when the Court was presented with a proposed pretrial order, having attached thereto a "partial consent decree."

Paragraph 24 of the proposed pretrial order, signed by counsel for all parties, stated:

"(24) All parties present for the Court's approval, a partial consent decree providing for prospective injunctive relief in the form of alterations in the defendants' hiring and promotion procedures. The partial consent decree specifically leaves open for the Court's determination the defendants' liability for back pay and attorneys' fees for each of the sub-classes, and the subsequent identification of class members' individual claims, should the Court find liability." (Underscoring added).

Shortly thereafter, on December 1, 1975, without notice to the Court, the defendants swore in Police Bureau Class No. 81 consisting of:

9 black females
15 black males
2 white males
2 white females

At that time, the only parties to the litigation were the two groups of black class-action plaintiffs and the city administration [Mayor Jackson by then had appointed, around June of 1974, defendant A. Reginald Eaves, a black, as Police Commissioner]. The Court examined the proposed partial consent decree and felt that since, by class representation, the interests of black policemen and black applicants were being vigorously represented before the Court, and since the proposed partial consent decree would seriously affect the interests of white policemen, and applicants, as well as possibly jeopardize the quality of police service by reducing qualification standards, the interests of white policemen and white applicants should be considered, and ordered copies of the proposed consent decree to be supplied to all members of the police force prior to approving same. Following that notice, the Court received requests for intervention by two police organizations, the Fraternal Order of Police and the Police Benevolent Association, each having a majority of white members, although each, the Court understands, has black members also. The Court allowed such interventions in an effort to have the benefit of thorough consideration of the proposed partial consent decree from all viewpoints, as well as because the requests to intervene indicated substantial interests were involved.

The Court directed counsel for plaintiffs, defendants and intervenors to work together as expeditiously as possible to see if a consensus could be developed as to whether the proposed consent decree should be approved in whole or in part, and directed the defendants not to implement the proposed decree prematurely.

Despite that admonition, on January 19, 1976, the defendants swore in a class (No. 82) of 22 officers, 20 black—2 white (44 black—6 whites in two classes sworn in within a period of a month and a half).

The Court then set the hearing on preliminary injunction which resulted in the preliminary injunction order here contested, but because of its oral and possibly misunderstood nature, has not proceeded to contempt on the basis of the January 19, 1976, violation of this Court's earlier oral order.

Subsequent to this Court's preliminary injunction order, and again without any prior notice, the Court has received information from defendant administration indicating, at least on its face, the completed restructuring of the police department which restructuring intervenors contend is largely oriented in favor of black officers.

The Court will consider first the defendants' contention that this case is controlled by *Parks v. Dunlop*, 517 F.2d 785 (5th Cir. 1975), where the Court of Appeals reversed this judge. The Court does not believe that case to be applicable here so as to create the presumption that defendants have a clear likelihood of success in reversing this Court's grant of a preliminary injunction.

*Parks v. Dunlop* involved one man and one federal position. After deciding that the District Court had jurisdiction (despite a plea that the exhaustion of administrative remedies doctrine applied) the Court of Appeals held that there was no showing that Parks would be irreparably harmed since ". . . the Secretary asserts that, should Parks prevail on the merits, the district judge would have the power to award him the position he seeks, despite the fact that a permanent appointment to that position had been made in the interval. This would mean that his only damages, if he were to be held entitled to prevail on the merits, would be the monetary loss calculated on the pay differential of the job sought and the one he holds." 517 F.2d 787.

Here, the situation involves many, indeed the entire Atlanta police force. It involves applicants as well as those already sworn in. And it involves the quality of police service itself. These considerations were articulated by the Court in its March 11, 1976 order leading to the conclusion of the Court, on page 7 of that order, that

failure to issue the preliminary injunction might well completely frustrate this Court's power to deal with a difficult situation. Thus, in addition to irreparable injury to interests not even yet identified or delineated, the Court's issuance of its preliminary injunction, to preserve the *status quo*, rests additionally on the traditional power of a Court to protect its own jurisdiction and processes as well as on what might be considered as avoidance of excessive, multiplicitous and circuitous litigation. Those factors were not present in *Parks v. Dunlop* where only one egg would have to be unscrambled [the Court understands that fortunately that case was subsequently settled]; here there would be a Cyclopian omelette subject to such hazard. As the Court said in *Parks v. Dunlop, supra,* "It is the threat of harm that cannot be undone which authorizes exercise of this equitable power to enjoin before the merits are fully determined." That threat of harm is present here.

Secondly, the Court must give careful consideration to the defendants' plea of hardship. The Court feels that the injunction as issued will impose no severe hardship on the operation of the police department. This is illustrated by a comparison of the Court's March 11, 1976 preliminary injunction with the proposed partial consent decree which all three appellants, including the city defendants, asked the Court to approve and thus implement.

Paragraph 1 of the proposed partial consent decree provided:

"The defendants (hereinafter referred to collectively as the City) are enjoined from engaging in any act or practice which has the purpose or effect of discriminating against any employee of, or any applicant or potential applicant for employment with the Atlanta Bureau of Police Services because of such individual's race."

Paragraph 2 of this Court's March 11, 1976, order restrained the City from:

"(a) Permanently assigning any vacant positions where race, creed or color is in any way a consideration in the selection of the assignee;

"(b) Permanently assigning any member of Police Academy Classes 81 and 82, or permitting the assignment of any such person to become permanent; and

"(c) Making any change in the assignment of any police officer or making any change in the composition of the Force of the Atlanta Bureau of Police Services (including civilian employees) which is in any way based upon or influenced by factors of race, creed, color, national origin or sex."

The Court perceives no substantial difference in the possible impact of these two paragraphs—one of which all three appellants asked the Court to approve—the other being the Court's actual order.

Paragraphs 2 and 3 of the proposed partial consent decree provided:

"2. The defendant City shall seek to continue to recruit and employ black persons in such numbers that they constitute at least 37% of new police officers hired in each future year as they did during 1973.

"3. In order to provide sufficient numbers of qualified black applicants the City shall, as a minimum, continue its current recruiting efforts. The City shall also use the facilities of the Bureau of Personnel Operations to recruit qualified minorities. Such effort on the City's part shall include announcements on radio, television and other media directed at the black population. The City shall also cooperate with and actively assist independent programs which are aimed at recruiting minorities for the Bureau of Police Services. The defendant City will also obtain and keep information reflecting the number of individuals recruited and the sex and minority designation of the individuals."

In paragraph 4 of its order of March 11, 1976, this Court provided:

"Defendants may continue their emphasis upon the recruiting of black applicants but selection of applicants for hire shall be based upon merit and qualifica-

tions without regard to race, creed, color, sex, religion or national origin."

Thus, there is no substantial difference between what the Court ordered, and what appellants asked the Court to order, with two exceptions. The City under this Court's order may, if it wishes, do what it would be ordered to do in paragraph 3 of the proposed consent decree; and, of course, this Court did not impose a quota, or minimum, of black persons to be hired as established in paragraph 2 of the proposed consent decree. Such a requirement was unnecessary—certainly prior to final action which the Court is attempting to expedite. The record in this case shows that in the Bureau of Police Services during 1975, 87% of all sworn personnel hired were black— 76% of all civilian personnel hired were black—80% of total personnel hired were black, more than twice the 37% specified in the proposed consent decree. And, of course, the figures set forth above for 1976 hirings continue that ratio.

Paragraphs 4–12 of the proposed consent decree provided for the hiring and disciplining of employees in great detail, with specific objection to certain tests and standards which might disproportionately exclude blacks. This Court merely provided that such action not be based on race, but rather on "merit, qualifications and length of service" (paragraphs 2, 4). There certainly was no need to proscribe the tests objected to as they have already been abandoned, according to the evidence.

Paragraph 5 of this Court's order has no counterpart in the proposed consent decree, but the Court would have great difficulty in believing it to be the source of any difficulty whatever to the city. It was prompted by the allegation that of three pregnant uniformed policewomen assigned to outside (street) detail, two black police women were temporarily assigned for the period of their pregnancy to office detail, the third (white) was not.

Paragraph 8 of this Court's order should be compared with Paragraphs 13 and 14 of the proposed consent decree. Paragraph 8 of this Court's order provides:

"The City shall furnish the Court, and counsel for all parties, a report as of the end of each month, within 15 days thereafter, of each and every hiring, firing, promotion, demotion, or suspension, with substantiating documentation and reasons therefor, as well as the status of the matter as of the effective date of the report. The report shall indicate the race and sex of the affected party. This paragraph of the Court's injunction will not apply to minor or routine transfers. However, if any party claims any such exempted action is contrary to the letter or spirit of this order, it may be brought to the Court's attention for appropriate action."

Paragraphs 13 and 14 of the proposed consent decree provide:

"13. The defendant City shall maintain, during the period of this decree, the records listed below:

"(a) All applications for the position of police officer including on such applications identification by race, sex and national origin (black, SSA, male, female).

"(b) All test results, whether written or practical, for both initial entrance and promotion, indicating the race, sex and national origin of the person being tested or rated.

"(c) All results of other selection procedures used in the hiring or promotion of persons in the Bureau of Police Services, such as, but not limited to, physical examinations, indicating the race, sex and national origin of the person involved.

"(d) All written communications between the defendants and applicants for both initial entrance and promotion.

"(e) All eligibility lists utilized for both initial entrance and promotion identified by race, sex and national origin.

"(f) A roster indicating the Bureau, Division, watch and, if applicable, beat assignment of each police officer by race, sex and national origin.

"(g) The names and addresses of all persons disqualified by the background investigation by race, sex, national origin and specific reason disqualified.

"(h) The actual results of all polygraph examinations given for the purpose of applicant screening including the specific reason for any persons disqualified by the polygraph examination and the race, sex and national origin of the applicant.

"(i) The names of all police officers terminated, by race, sex, national origin, actual reason terminated, date terminated and date of initial employment.

"14. The defendant shall supply plaintiffs thirty (30) days after the entry of this Decree, and thereafter quarterly, reports indicating by race, sex and national origin:

"(a) The number of applicants (for the first report this will be the number in the preceding calendar quarter).

"(b) The number of applicants for police officer positions disqualified by the phase of the screening process at which they are eliminated. Report background investigation separately from polygraph examination.

"(c) The names of police officers dismissed from the Recruit School indicating all grades received by course until their dismissal.

"(d) The number of terminations of probationary police officers by date and reason terminated.

"(e) The composition of units and specialized assignments and the composition of the Patrol Division including the watch and beat assignments of the police officers therein.

"(f) The composition of each rank.

"(g) The number of persons hired.

"(h) The number of persons promoted in each rank.

"(i) The number of persons remaining on current eligibility lists.

"(j) The number of persons demoted in each rank.

"(k) The number of persons disciplined for violation of departmental rules and regulations by the specific reason disciplined, the degree of discipline."

It is hard to see how defendants can complain of hardship resulting from this Court's order, paragraph 8, when they were quite willing to submit to the requirements of paragraphs 13 and 14 of the proposed consent decree.

Paragraph 7 requires no argument to show its appropriateness and lack of effect upon defendants.

In paragraph 6 of its order, the Court attempted to make clear that it did not wish to interfere unnecessarily with the operation of the Bureau of Police Services. The sole thrust and purpose of this Court's order is to proscribe the use of constitutionally prohibited factors as a basis of personnel action.

The evidence in this case shows that, at the inauguration of the present administration, the composition of the police department was

| white | 1149 | 79% |
| black | 306 | 21% |

This condition apparently stemmed in large part from the higher failure rate by blacks in the selection process. Even so, according to paragraph 2 of the proposed consent decree, 37 of the new police officers hired in 1973 (the last year under the prior administration) were black.

■ There will be few who would challenge the proposition that, in view of their almost equal proportions in the city's population, the proportion of blacks to the total force should be larger. But reverse discrimination is not the answer. Affirmative action is permissible to eliminate and remedy the effects of past discrimination, otherwise discrimination on the basis of race is prohibited. Thus, in *Brunetti v. City of Berkeley* (U.S.D.C., N.D.Cal.), October 17, 1975 (11 E.P.D. ¶ 10,804, p. 7365) the Court stated:

"The cases clearly indicate that preferential treatment of minorities is required and permitted only during a period of transition to a work force in which all vestiges of past discrimination have been eliminated by affirmative action. The rights of non-minority employees may not be violated in absence of a purpose to compensate minority employees from the effects of past discrimination. A Second Circuit opinion indicates the distinction

between permissible and impermissible preferential treatment: "however, while quotas merely to attain racial balance are forbidden, quotas to correct past discriminatory practices are not.' *United States v. Wood, Wire and Metal Lath. Int. Union, Local No. 46*, 471 F.2d 408, 413 (2 Cir. 1973)."

There has been no finding of past discrimination in this case, although the statistics point in that direction. But, even assuming that point, preferential minority hiring is the province of the Court, not the defendant. *NAACP v. Allen*, 493 F.2d 614, 618 *passim* (5th Cir. 1974).

In this case, the ultimate burden of the Court will be to determine what, if any, discrimination exists or has existed in the police department, and, if any, fashion an appropriate remedy therefor. The Court has requested counsel for all parties to meet promptly and see how much of the proposed consent decree can be implemented without further hearings and how much must be litigated. The Court stands ready to expedite the case in any way possible. In the meantime, the Court does not wish to be confronted with a *fait accompli* which cannot be undone without mass firings or hirings much of which might be without either the legal or practical power of the Court, or certainly would make the task of the Court very much more difficult.

The Court will defer the hearing on intervenors' motion to cite defendant Eaves for contempt until defendants have the opportunity to seek a stay from the Court of Appeals for the Fifth Circuit.

Defendants' motion to stay the order of March 11, 1976, is DENIED.

This order shall be presented to the panel of the Court of Appeals to whom the request for stay is presented.