CAMEO CONVALESCENT CENTER, INC., a corporation organized under the laws of the State of Wisconsin, Plaintiff,

v.

Terry WILLKOM, individually and in his official capacity as the Deputy Secretary of the Department of Health and Social Services, of the State of Wisconsin, Defendant.

No. 83-C-385.

United States District Court, W.D. Wisconsin.

Oct. 21, 1983.

DeWitt, Sundby, Huggett & Schumacher, Madison, Wis., for plaintiff.

Charles D. Hoornstra and Steven C. Underwood, Asst. Attys. Gen., Madison, Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Before the Court is the motion of the defendant for summary judgment. Plaintiff claims a violation of constitutional rights by virtue of a malicious prosecution and abuse of process on the part of the defendant. Defendant, in his motion, asserts three grounds for granting him summary judgment: First, that plaintiff's complaint attempts to base liability on a *respondeat superior* basis; second, that he is enti-

tled to absolute prosecutorial immunity; and, third, that plaintiff's complaint fails to state a claim for a constitutional violation.

Jurisdiction is based on 28 U.S.C. § 1343 for a violation of 42 U.S.C. § 1983. Venue is proper in this district.

The facts are as follows:

## FACTS

1. Plaintiff Cameo Convalescent Center, Inc., a Wisconsin corporation, is a licensed nursing home under the laws of Wisconsin (Cameo).

2. Defendant Terry Willkom (Willkom), during the time pertinent to this action, was Deputy Secretary of the Department of Health and Social Services (Department). From May, 1980, until July, 1981, Willkom was the acting administrator of the Department's Division of Health (Division).

3. On September 19, 1978, Darla Senn, a nurse surveyor within the Bureau of Quality Compliance, an agency within the Division, conducted an annual survey of Cameo. As a result of this survey, she issued 31 Notices of Violation (NOV's).

4. Of the 31 NOV's, 22 were Class C (violations which do not directly threaten the health, safety or welfare of a nursing home resident); 7 were Class B (directly threatening to health or safety, but not life threatening); and 2 were federal deficiencies which were not subject to state licensing laws.

5. Issuance of the Notices of Violation by Senn constituted a determination by the Department that the nursing home was in violation of the rules of the Department.[1]

6. At this time (September, 1978), Willkom had substantial involvement with the Division of Health by virtue of being the person within the office of Secretary of the Department with expertise in health-related matters. However, Willkom had no di-

---

1. The parties have disputed this fact. Cameo disputes the use of the term "determination." In the context of § 50.04(4)(a), Wis.Stats.1977, the Court understands the term to be analogous to a finding of probable cause on the part of the person issuing the NOV. The statutes give a nursing home the right to contest the NOV through a hearing process. Thus, the Court believes that the essence of Cameo's position on this fact is accepted for purposes of the motion before the Court.

rect responsibility for the training of nurse surveyors, nor for the conduct of any specific annual survey. Nor did Willkom have any direct supervisory control over the day-to-day activities of nurse surveyors.[2]

7. With regard to the inspection of Cameo by Senn in September, 1978, Willkom had no knowledge of the inspection either before or immediately after the issuance of the NOV's. Willkom did not review the NOV's issued by Senn, nor did he, in the ordinary course of his duties, review any actions of the Bureau of Quality Compliance with regard to nursing homes unless receivership or closing of a facility had been recommended by the Division of Health.[3]

8. On September 28, 1978, Cameo petitioned for a hearing on the NOV's and for other relief. This request was in accordance with the statutory review framework which included the right to a hearing, the opportunity to present evidence, and the right to appeal adverse rulings to the Circuit Court with review to the Court of Appeals. Review by the Wisconsin Supreme Court was discretionary with that Court. Court review was not *de novo*. Factual findings were limited to the record presented within the administrative process and agency factual findings were accorded deference.

9. On October 4, 1978, Cameo was advised by the Department that the hearing requested a week earlier would be delayed pending receipt of Cameo's Plans of Correction (POC's). Further, Cameo was denied an extension of time in which to file POC's because, by statute, all POC's not requiring substantial capital outlays had to be submitted within 15 days. Further, by statute,

a failure by the nursing home to submit POC's caused the imposition of POC's by the Department. On October 17, 1978, POC's were imposed on Cameo. Cameo appealed this action.

10. In early 1979, Cameo moved that the NOV's be dismissed and the POC's be withdrawn because the Department had failed to convene a hearing within 30 days as required by statute. The motion was denied by the hearing examiner because the 30-day requirement was, according to department policy, directory rather than mandatory. In April, 1973, Cameo directed a motion to dismiss the proceedings to Secretary Donald Percy, the head of the Department. Percy denied the motion based on his delegation of decision-making authority to the hearing examiner.[4]

11. The POC's were imposed without the knowledge or participation of Willkom.

12. In early January, 1979, another nurse surveyor, Jane Preston, conducted a verification visit to Cameo and found that 24 of the 31 NOV's had been corrected, 3 were uncorrected, and 4 others were found to have acceptable progress toward correction.

13. Because of the unimplemented POC's cited after this verification, and because of changing of placement criteria by the Department, Cameo was placed on the Suspension of Referrals (SOR) list in March, 1979. This was the first such list prepared. Cameo appealed its placement on the list and should have been deleted from the list pending appeal. The list was published and disseminated to interested

2. The first sentence in this paragraph substantially comports with the finding suggested by plaintiff. From this statement of general supervisory responsibility, Cameo attempts to raise an issue of fact as to the specific activities of Willkom. However, the lack of direct responsibility on the part of Willkom is not disputed.

3. Cameo asserts that Willkom was in a position to know of the annual nursing home inspections, and that he had indirect involvement with the issuance of NOV's to Cameo because of his general supervisory duties. The Court

accepts these assertions for the purposes of argument, but must conclude that they in no way raise a material issue of fact with respect to Willkom's knowledge or to the level of supervision which he exercised.

4. Cameo claims that the delegation was backdated to January 3 although the delegation did not officially occur until April. This appears to be true although the Court does not believe that the fact is material, except to the extent that it raises a question about the impartiality of the hearing examiner.

parties in April, 1979, with Cameo on the list.

14. On April 13, 1979, letters retracting Cameo's inclusion on the SOR list were sent out to the recipients of the list.[5]

15. Willkom did not participate in the preparation of the Suspension of Referrals list. Although nursing home regulation matters had become fairly controversial because of the process at issue here (which was newly enacted at that time), there is no evidence that Willkom had any specific duties or responsibilities with respect to preparation of the list. On or about March 26, 1979, Willkom attended a meeting in Milwaukee with staff on Quality Compliance issues in order to familiarize himself with the process.[6]

16. On the trip back to Madison after the above mentioned meeting, Willkom was told by an attorney for the Department, Thomas Van de Grift, that several NOV's which had been issued by nurse surveyors to various nursing homes, including Cameo, were legally unsupportable.

17. Willkom told Van de Grift that an internal dispute of significant proportions had grown in the Department between legal and medical personnel. The medical people, including nurse surveyors, were having difficulty relative to the rules of evidentiary hearings while the attorneys appeared to be insensitive to medical obser-

vation and medical record documentation. The Department would be trying to bring the two sides together and Willkom suggested it might be a good idea to proceed to hearing on the allegedly unsupportable NOV's in order to provide the nurses with a learning exercise on the problems in the hearing process.

18. Willkom's approach at that time was that, if the citations were made, he felt that the hearing process should be carried through to determine if they were supportable. He rejected any notion of dropping the prosecution of the citations in advance because, if the citations were wrong, the hearing process would prove them wrong. There is evidence that political pressure from the legislature influenced his decision in this regard.[7]

19. All actions taken throughout the process by Willkom were done under color of state law. In July, 1980, while Willkom was Acting Administrator of the Division of Health, he signed a settlement agreement with Cameo dismissing almost all of the outstanding NOV's.

20. For purposes of this motion, the Court assumes that the issuance of 31 NOV's by Darla Senn in September, 1978, was without probable cause and that Senn was motivated by a desire to punish Cameo for the exercise of its First and Fourteenth Amendment rights.

---

**5.** Cameo asserts that the record is silent on whether the retraction was sent to all recipients of the list. This is true. The record appears to be silent completely on this matter. For purposes of the motion, the Court will assume that some recipients did not receive the retraction.

**6.** Cameo's objections to the findings of fact from which this paragraph is drawn are unsupported. The objections evidence an attempt to draw inferences of specific, direct involvement from undisputed evidence of generalized interest and knowledge of the subject matter. That is, from Willkom's position of power in the Department, Cameo attempts to raise an issue of disputed fact concerning his involvement in the enforcement proceedings against Cameo. Such an inference is offered without any facts in support.

**7.** With respect to this paragraph, Cameo asserts that Willkom influenced decisions as to whether particular prosecutions, especially those garnering publicity such as Cameo's, would be pursued or terminated. This is clearly true, but only with respect to the time frame (March-April, 1979), and is evidenced by the facts cited in this paragraph. From this, and from the fact that Willkom received some memos detailing the development of the suspension of referrals list, Cameo attempts to raise an inference that Willkom was responsible for Cameo's placement on the list. From the standpoint of administrative responsibility, the inference is not legitimate. However, the Court is willing to assume a causal connection between the decision to continue prosecution of the NOV's and Cameo's placement on the list, and that Willkom knew or should have known that Cameo's placement on the list would result from his decision.

21. A subsequent nursing home survey of Cameo in 1979 resulted in a number of new NOV's. Secretary of the Department, Donald Percy, Willkom's immediate supervisor, overruled a hearing examiner's dismissal of some of these NOV's.

## MEMORANDUM

Defendant contends that, to the extent plaintiff's complaint attempts to make Willkom responsible for the actions of Darla Senn, the complaint bases his liability on the doctrine of *respondeat superior,* which is not available in § 1983 actions. *Adams v. Pate,* 445 F.2d 105 (7th Cir.1971). Defendant also contends that his decision to continue the prosecution of Cameo, even after being informed that the NOV's were legally unsupportable, is protected by the doctrine of prosecutorial immunity enunciated in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 894 (1978).

## I. SUPERVISORY LIABILITY

In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court held that liability under § 1983 could not be predicated on a "failure to act in the face of a statistical pattern" of misconduct by subordinates. *Id.* at 376, 96 S.Ct. at 606. In *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), this holding was explained as follows:

> [T]he mere right to control (subordinates) without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability.

*Monell,* supra at 694, 98 S.Ct. at 2037.

No matter how broadly or liberally the facts of this case are read, the extent of defendant Willkom's supervisory activity here cannot be said to have created liability on his part for the activities of the nurse surveyor, Darla Senn. Only in the most literal sense did Willkom have the "right to control" the nurse surveyors.

The Court can concede to plaintiff the proposition that Willkom's position as Deputy Secretary with special interest and expertise in health related matters might have allowed him to exercise significant control over the day-to-day activities of the staff of the Bureau of Quality Compliance. But it is undisputed that he neither exercised any control over their activities or training, nor had any reason to believe that closer supervision or control were necessary at least until late March of 1979. He was, at least, one step removed from a position where he might be said to have had a duty to supervise the surveyors. And, as it concerns Cameo in particular, the evidence is clear, without any room for contrary inference, that he knew nothing of Cameo or Darla Senn's actions until he decided, in March, 1979, to allow the questionable NOV's to proceed through the administrative process.

It is appropriate to specify precisely what it is that Cameo alleges is Willkom's responsibility. Cameo claims that Darla Senn, maliciously and in order to retaliate against Cameo for the exercise of its First and Fourteenth Amendment rights, issued 31 NOV's against Cameo. Until the decision by Willkom in March, 1979, there is a total absence of any direction or control being exercised by Willkom, and a similar lack of evidence that Willkom knew or should have known of Darla Senn's actions, much less her motivation.

It has been said that supervisory liability should attach:

> Only when "the failure to supervise or the lack of a proper training program was so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of the plaintiff's constitutional rights." *Owens v. Haas,* 601 F.2d 1242, 1246 (2nd Cir.), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

*Starstead v. City of Superior,* 533 F.Supp. 1365, 1370 (W.D.Wis.1982) (footnote omitted). Recalling *Rizzo,* supra, where a pronounced pattern of racially discriminatory actions on the part of the police department was insufficient to establish liability on the part of the police chief and mayor, the

Court must conclude that Cameo presents a case which cannot be considered close. Assuming that Cameo was deprived of constitutional rights, Willkom was neither deliberately indifferent to the deprivation nor grossly negligent because he knew nothing about the case until he made the decision to let the administrative process run its course.

Although it is by no means clear, it may be that Cameo is attempting to assess liability on a separate basis for Willkom's failure to prevent Cameo's placement on the suspension of referrals list. The analysis above is equally applicable to this allegation. There is no factual issue raised regarding his involvement in this particular aspect of the case. To the extent that it can be said that his decision to continue the prosecution of the NOV's *caused* Cameo's placement on the list, the discussion below regarding prosecutorial immunity disposes of the question. As far as Willkom's administrative (as opposed to prosecutorial) responsibilities may have had anything to do with Cameo's placement on the list, the record discloses nothing which overcomes the bar against liability based on a *respondeat superior* theory.

## II. PROSECUTORIAL IMMUNITY

In *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court held that, while absolute "official" immunity was unavailable to federal executive agency officials, the doctrine of absolute immunity accorded to judges and prosecutors was available to agency officials whose duties were analogous to those of judges and prosecutors. The Court left no doubt that its analysis was equally applicable to state agency officials.

It is undisputed that Willkom's decision to continue the prosecution of Cameo, even after being advised by the attorney prosecuting the case that the NOV's were not supportable, was a prosecutorial decision. Argument by analogy being the normal manner of proceeding on this question, it is appropriate to point out that Willkom's decision was like that of a district attorney who advises a subordinate to continue a criminal prosecution despite the subordinate's doubts about the case. Whether motivated by political considerations (arguably the case here) or by malice, the district attorney would be protected by absolute immunity. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). If that were the end of the inquiry regarding agency prosecutors, Willkom should be entitled to immunity as well.

However, that is not the end of the inquiry. Cameo does not resist summary judgment because Willkom's functional role was not that of a prosecutor. Cameo concedes, as it must, that his role was prosecutorial. Rather, Cameo claims that the administrative process was not impartial enough to allow for the defense of absolute immunity as delineated in *Butz.*

In granting immunity to agency officials performing an adjudicatory function, the Court stated that a prerequisite to the protection was a formal system of procedural restraints such as that embodied in the Administrative Procedure Act, Title 5, United States Code. This assurance of impartiality is necessary before an agency adjudicator can be granted immunity. *See Harris v. Powers,* 520 F.Supp. 111 (W.D.Wis.1981). Cameo raises questions concerning adjudicatory impartiality in order to defeat Willkom's motion. The questions concerning the delegation of power to the hearing examiner and the reversal of another hearing examiner on a subsequent set of NOV's against Cameo are the facts relied upon to dispute the impartiality of the process.

Willkom counters that this analysis is proper only with respect to immunity for adjudicators, not for those positions analogous to prosecutors such as he. There is some persuasive force for this argument. Justice Rehnquist, in concurring with the opinion of the Court on this matter, recognized the differentiation among three types of officials: The adjudicator; the person responsible for the decision to initiate or continue a proceeding; and the person who presents evidence on the record. *Butz,* 438 U.S. at 517–518, 98 S.Ct. at 2916–2917.

Willkom is the second type; that is, one who is responsible for continuing a proceeding. The detailed analysis of the administrative process was applied only to the first—the adjudicator.

However, the Court in *Butz* seemed to require impartiality before granting immunity to a person in Willkom's shoes as well.

We believe that agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment. *Because the legal remedies already available to the defendant in such a proceeding provide sufficient checks on agency zeal,* we hold that those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision.

*Butz,* at 516, 98 S.Ct. at 2915 (emphasis supplied).

Assuming the above requires an inquiry into whether the process of adjudicating nursing home citations provides "sufficient checks on agency zeal," the question is whether Willkom has established that the process passes muster. The inquiry has been held to be quite laborious. *See,* for example, *Mason v. Melendez,* 525 F.Supp. 270 (W.D.Wis.1981). However, the most recent statement on this issue by the Seventh Circuit Court of Appeals has indicated that establishing impartiality is not nearly that difficult.

In *Reed v. Village of Shorewood,* 704 F.2d 943 (7th Cir.1982), the Court considered an immunity defense raised by a village mayor who also served as the local liquor commissioner. In a course of conduct which can best be described as a vindictive scheme of harassment, a local tavern licensee was driven to give up his liquor license. After deciding that these acts constituted a deprivation of property without due process, the Court proceeded to the immunity question.

With regard to the mayor's acts which could be characterized as falling within the ambit of prosecutor or adjudicator, the Court stated:

It is true that the Supreme Court in *Butz* stressed that the Administrative Procedure Act protects the independence of administrative law judges and thereby reduces "the risk of an unconstitutional act by one presiding at an agency hearing," and there is no suggestion of such protection here. But *Ashbrook v. Hoffman,* 617 F.2d 474, 476–477 (7th Cir.1980), decided after *Butz,* held that Indiana's partition commissioners, who have functions in relation to partition sales of real estate analogous to those of Illinois local liquor control commissioners in relation to liquor licenses, were absolutely immune from damage liability even though as in the present case there was no suggestion that their independence was hedged about by safeguards like those provided by the Administrative Procedure Act. The basis of the absolute immunity of judges is less that they are unlikely to commit wrongs than that their wrongs are largely remediable through the appellate process and that forcing judges to defend their judicial rulings by standing trial on the complaint of a disappointed litigant would make it difficult for them to carry out their judicial duties and for society to recruit competent judges.

Thus, formality of process and absolute independence are not necessary before immunity can be successfully asserted. It is enough that the process provides for appellate review. The fact that the preliminary process may not be insulated from abuse matters not at all. Nor does it matter, although Cameo takes pains to raise the issue, that the standard of review is not *de novo. Id.* at 951. It should be noted that another fact, which was influential in both *Butz* and *Reed,* is also present here. Impartiality is, if not established, at least strongly suggested, when the complaining party ultimately prevails in the process, either before an administrative agency (*Reed* at 951) or through appeal to a court of record (*Butz,* 438 U.S. at 516, 98 S.Ct. at 2915).

■ Unquestionably then, Willkom has established sufficient impartiality in the process to allow him to avail himself of the

immunity set forth in *Butz.* Cameo's attempts to raise a genuine issue of ultimate fact, while imaginative, must be rejected. The availability of the appellate process, and the fact that Cameo ultimately prevailed in the very administrative process which it contends is insufficiently impartial, leave no doubt that prosecutorial immunity must be granted to Willkom for the decision to continue the prosecution of the NOV's issued against Cameo.

## CONCLUSION

Not even the most liberal inferences in favor of Cameo can create a genuine issue of fact relative to Willkom's liability as a supervisor. In accordance with the principles enunciated in *Rizzo* and *Monell,* it must be concluded that Willkom cannot be assessed liability.

Likewise, there is no genuine issue of fact regarding the issue of prosecutorial immunity. Undisputed facts establish that Willkom qualifies for the absolute immunity granted to those responsible for the decisions to initiate or continue administrative proceedings in *Butz.*

## ORDER

IT IS ORDERED that defendant's motion for summary judgment is GRANTED. Judgment shall be entered in favor of the defendant with prejudice and costs.