**Ernesto CASAS, Plaintiff,**

v.

**CITY OF EL PASO, Defendant.**

**No. EP–06–CV–101–PRM.**

United States District Court,
W.D. Texas,
El Paso Division.

April 26, 2007.

**544**

Mike Milligan, Attorney at Law, El Paso, TX, for Plaintiff.

Carlos Rincon, John Lomax Anderson, Rincon Mounts, P.C., Jennifer F. Callan, El Paso City Attorney's Office, El Paso, TX, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARTINEZ, District Judge.

On this day, the Court considered the following: (1) Defendant City of El Paso's ("the City" or "Defendant") "Motion for Summary Judgment" and accompanying appendix, filed on January 30, 2007; (2) Plaintiff Ernesto Casas' ("Plaintiff") "Response to Defendant's Motion for Summary Judgment" and accompanying appendix, filed on February 13, 2007; and (3) Defendant's "Reply to Plaintiff's Response to its Motion for Summary Judgment," filed on February 14, 2007, in the above-captioned cause. Defendant asks the Court to grant summary judgment in its favor on all of Plaintiff's claims, which allege that Defendant violated the Americans with Disabilities Act ("ADA") on multiple occasions by charging a fare on its regular bus route to Plaintiff's personal care attendant ("PCA") and by the rude treatment of Plaintiff by the City's bus drivers. After careful consideration, the Court is of the opinion that Defendant's Motion should be granted in part and denied in part for the reasons that follow. Specifically, the Court believes that summary judgment is appropriate on Plaintiff's requests for damages stemming from the City's alleged harassment and for a permanent injunction against the City, but that summary judgment should be denied as to Plaintiff's requests for damages stemming from the occasions on which Plaintiff had to pay the fare for his PCA.

## I. BACKGROUND

### A. Public Accommodation & the Americans with Disabilities Act

 Title II of the ADA prohibits the providers of public services from discriminating against disabled individuals. 42 U.S.C. § 12131 *et seq.; Melton v. Dallas Area Rapid Transit,* 391 F.3d 669, 671 (5th Cir.2004). To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate three elements: (1) the plaintiff is a "qualified individual within the meaning of the ADA;"[1] (2) the plaintiff is "being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity;" and (3) "such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton,* 391 F.3d at 671–72. When considering whether a plaintiff demonstrates discriminatory actions on the basis of his disability in order to satisfy the third element, the Court must keep in mind that "[d]iscrimination on the basis of disability differs from discrimination in the constitutional sense." *Id.* at 672. The ADA provides the definitions of discrimination, and the Court looks only to the requirements of the ADA to determine whether the City has discriminated against Plaintiff on the basis of his disability. *Id.*

 The relevant definition of discrimination for Plaintiff's claims is contained in Title II of the ADA, which governs the provision of public services and contains two parts: "part A covers public services generally; part B applies specifically and only to public transportation provided by public entities." *Id.* at 671 (internal citations omitted). Part B includes "a comprehensive scheme detailing the re-quirements for compliance with the ADA, including a definition of discrimination to be used in determining compliance of paratransit services with the ADA." *Id.* at 674. One of the definitions of discrimination in part B states:

> It shall be considered discrimination ... for a public entity which operates a fixed route system ... to fail to provide ... paratransit and other special transportation services to individuals with disabilities ... that are sufficient to provide to such individuals a level of service (1) which is comparable to the level of designated public transportation services provided to individuals without disabilities using such system; or (2) in the case of response time, which is comparable, to the extent practicable, to the level of designated public transportation services provided to individuals without disabilities using such system.

42 U.S.C. § 12143(a). In other words, public entities that provide a fixed route system of public transportation must also provide to disabled individuals paratransit and other special transportation services that are comparable to the services provided to individuals who do not have disabilities. *Id.; Melton,* 391 F.3d at 673. The public entity must submit a plan to the Secretary of Transportation that details how the public entity will provide paratransit and special transportation services in accordance with the requirements of the ADA. 42 U.S.C. § 12143(c)(7). In the context of public transportation, non-compliance with the approved plan for the provision of paratransit services constitutes discrimination under the ADA. *Melton,* 391 F.3d at 675 ("Once the plan is approved, the public entity is required to provide paratransit services in accordance with the plan. Providing paratransit ser-

---

**1.** It is undisputed that Plaintiff is a "qualified individual with a disability" as defined by Title II, Section 201 of the ADA. 42 U.S.C. § 12131(2); Def.'s Mot. ¶ 1.

vices not in accordance with the plan is the prohibited discrimination.").

### B. Factual and Procedural Background

The City of El Paso is a public entity that provides public transportation, and so, must comply with the ADA. Pl.'s Compl. ¶ 2. At issue in this case are the transportation services provided by Sun Metro, the public entity that operates the City's bus system. Sun Metro provides two services: (1) its regular bus route, which is a "fixed route system," as defined in 42 U.S.C. § 12141(3); and (2) the "LIFT," which is a complementary paratransit system for individuals with disabilities. Def.'s Mot, App. ¶¶ 2–3. The LIFT does not operate on a fixed route or schedule; instead, the LIFT vehicles pick up a passenger upon request. *Id.*, App. ¶ 3. If an individual needs a personal care attendant in order to use public transportation services, the ADA requires that the public entity allow the personal care attendant to accompany the disabled individual on the complementary paratransit system at no extra charge. 49 C.F.R. § 37.131(c)(3). Sun Metro allows the personal care attendants of qualified individuals to ride both the LIFT and the fixed route system for free, Def.'s Mot., App. ¶ 5, and issues such individuals a PCA card, Pl.'s Compl. ¶ 5. The City

maintains that federal law requires only that PCAs be allowed to ride the LIFT, the City's complementary paratransit service, for free, and that Sun Metro's provision of free transportation for PCAs on the fixed route system is not required by the ADA. Def.'s Mot. ¶ 1.

In his complaint, Plaintiff alleges that the City violated the ADA on multiple occasions by requiring Plaintiff's personal care attendant to pay a fare on its fixed route system, Pl.'s Compl. ¶ 7, and by retaliating against him for his efforts to exercise his "ADA-protected right of reasonable access to public transportation,"[2] *id.* ¶ 18. Specifically, Plaintiff alleges that on about ten or eleven different occasions, from the end of November 2003 through mid-October 2004, he was required to pay for the fare of one of his sons, who each serve as his personal care attendants, on Sun Metro's fixed route system.[3] *Id.* ¶ 7. On one of these occasions, Plaintiff alleges that the Sun Metro bus driver called a security guard when Plaintiff protested that his PCA should be allowed to ride for free, and that the security guard threatened to handcuff Plaintiff.[4] *Id.* ¶ 8. Plaintiff claims that again on or about January 13, 2005, three different drivers refused to "honor the PCA designation" on his card. *Id.* ¶ 9. Plaintiff stated in response to De-

---

**2.** It is undisputed that Plaintiff is "an individual with a physical and mental impairment which makes him unable, without the assistance of another individual" [hereinafter "personal care attendant" or "PCA"], to use public transportation services, within the meaning of 42 U.S.C. § 12143(c)(1)(A)(I). Pl.'s Compl. 1; Def.'s Mot. ¶¶ 1, 8. Specifically, Plaintiff suffers from post-traumatic stress disorder, major depression, anxiety, and panic attacks. Pl.'s Resp., Ex. 13 ¶ 1.

**3.** Defendant does not contest that these events happened, but does contest some of the details surrounding the events. Def.'s Mot. ¶ 9.

**4.** In an affidavit submitted by the bus driver involved in this incident, Defendant provides

another version of the events of this day. Def.'s Mot., App. 2. The bus driver maintains that both of Plaintiff's sons were accompanying Plaintiff, and that Plaintiff argued that both of his sons should be able to ride for free under the terms of his PCA card. *Id.* The bus driver allegedly informed Plaintiff that only one of his sons could ride for free, and that Plaintiff would have to pay the fare for his other son. *Id.* The bus driver claims that he phoned security only when Plaintiff became "enraged" and refused to pay the fare for his son. *Id.* Plaintiff is adamant that only one of his sons was with him on that day. Pl.'s Resp., Ex. 13 ¶¶ 3–4.

fendant's interrogatories that he cannot remember whether any of the bus drivers required him to pay for his PCA's fare on January 13, 2005. Def.s Mot., App. 215.

In connection with these events, Plaintiff hired an attorney in April 2005, who scheduled a meeting with an attorney for the City for July 14, 2005. Pl.'s Compl. ¶ 10. On the way to that meeting, a bus driver allegedly refused to allow Plaintiff's PCA to ride for free. Id. ¶ 11. While the bus driver eventually "relented and allowed them to board without paying," Plaintiff alleges that the incident "drew the attention of most (if not all) of the other passengers, many of whom stared at Mr. Casas and his son, causing both of them discomfort and embarrassment." Id.

As a result of the July 14 meeting, Sun Metro conducted an investigation, and on August 4, 2005, Sun Metro informed Plaintiff and his attorney that the issue had been resolved. Id. ¶ 12. Sun Metro reported that it had issued a memo about the PCA policy to all bus drivers, that it sent text messages to its fleet reiterating the PCA policy, and that it had directed its supervisors in the northeast, the primary area of the incidents, to remind the bus drivers about the policy. Id.

Plaintiff does not allege that he was required to pay for his PCA at any time after the remedial actions taken by Sun Metro in July and/or August 2005. Id. ¶¶ 16–18. However, Plaintiff does allege that on at least three separate occasions after August 4, 2005, bus drivers argued with Plaintiff over the fare for his PCA, much to his embarrassment. Id. ¶¶ 13–16. On one of those occasions, Plaintiff and his son "felt uncomfortable and embarrassed, so much so that they had to leave the bus several blocks before their scheduled stop and complete their journey on foot." Id. ¶ 13. When Plaintiff again complained to the City, the City's attorney responded on January 25, 2006, by referring to the ac-

tions taken in July and/or August 2005 and stating: " 'I do not believe that your client has experienced any similar events in the recent past. However, please let me know if I am mistaken.' " Id. ¶ 17.

On March 10, 2006, Plaintiff filed a complaint in the above-captioned cause, alleging that the City had violated the Americans with Disabilities Act and requesting compensatory damages, attorney's fees, and a permanent injunction. Id. at 6–7. Defendant argues that Plaintiff cannot satisfy the second and third elements necessary to establish a prima facie case of discrimination, i.e., that the City discriminated against him and that such discrimination was because of his disability, and asks the Court to grant summary judgment in its favor on all of Plaintiff's claims.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) mandates summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying the parts of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although the movant must " 'demonstrate the absence of a genuine issue of material fact,' [it] need not *negate* the elements of the non-movant's case." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548). A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under the governing law. *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the evidence indicates that a reasonable fact-finder could find in favor of the non-moving party. *Id.*

Because the moving party has the burden of proof, evidence is construed in favor of the nonmovant, and the non-movant is given the benefit of all favorable inferences. *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986). When the moving party has properly supported its summary judgment motion, the non-moving party must come forward with "significant probative evidence" showing that there is an issue regarding material facts. *Ferguson v. Nat'l Broad. Co.,* 584 F.2d 111, 114 (5th Cir.1978). If the movant satisfies his initial burden, the non-movant must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting FED.R.CIV.P. 56(e)) (emphasis omitted). In other words, "the non movant must adduce evidence which creates a material fact issue concerning each of the essential elements of its case for which it will bear the burden of proof at trial." *Abbott v. Equity Group, Inc.,* 2 F.3d 613, 619 (5th Cir.1993). The court must resolve factual controversies or disputes in the non-movant's favor, but "only when there is an *actual* controversy, that is, when both parties have submitted evidence of contradictory facts." *Little,* 37 F.3d at 1075 (emphasis added). The court should not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* (emphasis omitted).

The non-movant must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions· on file,'" identify those facts establishing a genuine issue

for· trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "This burden is not satisfied with·'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little,* 37 F.3d at 1075 (internal citations omitted). Likewise, "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis omitted). The non-movant "is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998).

## III. ANALYSIS

### A. Harassment

■ Plaintiff alleges that the harassment he suffered, in the form of the bus drivers' rudeness and arguments over whether his PCA could ride for free, constitutes discrimination under Title II of the ADA. Pl.'s Resp. 6. Plaintiff recognizes that no court has yet recognized harassment as a cause of action under Title II, the public accommodations section of the ADA. *Id.* Plaintiff suggests that the elements of harassment under Title II would be similar to the elements of a Title I workplace harassment ADA claim. *Id.* at 9–10. "The legal standard for workplace harassment in this circuit is ... high." *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 509 (5th Cir.2003). In order to recover on a disability-based harassment claim, the harassment in the workplace "must 'be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.'" *Flowers v. S. Reg'l Physician Servs. Inc.,* 247 F.3d 229, 236 (5th Cir.2001) (quoting

*McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 563 (5th Cir.1998)).

■ The Court finds that it need not determine whether harassment is a cognizable cause of action under Title II of the ADA. *See McConathy,* 131 F.3d at 563 ("In this case, we will proceed as though [a cause of action for hostile environment harassment under Title I of the ADA] exists .... We do not feel this is the appropriate case to make such a determination, and we merely will assume such a cause of action exists for the sake of argument."). Even assuming that such a cause of action exists, the Court finds that the alleged seventeen incidents of rudeness during a two-year-plus period of bus trips, at a rate of fifteen bus trips per week, does not constitute the kind of severe or pervasive harassment required for recovery for disability-based harassment. *Cf. Soledad v. U.S. Dep't of Treasury,* 304 F.3d 500, 502–03 (5th Cir.2002) (affirming summary judgment in favor of the defendant on a plaintiff's disability-based workplace harassment claims because the alleged harassment was not sufficiently severe or pervasive even though the plaintiff's supervisor allegedly questioned plaintiff's disabled status, made "derogatory comments" to the plaintiff and to others about the plaintiff's work restrictions, hampered the plaintiff's ability to attend therapy, and told the plaintiff that he would be terminated because of the work restrictions ordered by his doctor); *McConathy,* 131 F.3d at 563–64 (holding that the actions of a plaintiff's supervisor, such as directing staff to stop talking to plaintiff, excluding plaintiff from business meetings, refusing to acknowledge plaintiff's presence, telling plaintiff that he "would 'no longer tolerate her health problems,'" and pressuring her to return to work before she had fully recovered from jaw surgery, "while insen-

sitive and rude, would not be sufficient as a matter of law to state a claim of hostile environment harassment"). Plaintiff was understandably distressed when bus drivers questioned his disabled status, refused to honor his PCA card, or suggested that he and his sons "were being dishonest in trying to ride free." Pl.'s Resp., Ex. 13 ¶¶ 8–15. Certainly, the incident in which the bus driver summoned a security guard caused Plaintiff embarrassment. *Id.,* Ex. 13 ¶¶ 3–10. However, the Court believes that these isolated incidents do not rise to the level of actionable harassment, assuming such a claim is cognizable under Title II. Accordingly, Defendant is entitled to summary judgment on Plaintiff's harassment claims.

### B. Permanent Injunction

■ Plaintiff asks the Court to issue a permanent injunction against the City, requiring the Sun Metro bus drivers to honor Plaintiff's PCA card and to stop harassing Plaintiff and causing him irreparable "inconvenience and indignity." Pl.'s Compl. ¶ 19. "When a plaintiff seeks to enjoin the activity of a government agency, ... his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Rizzo v. Goode,* 423 U.S. 362, 378–79, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (internal quotation omitted). "This 'well-established rule' bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." *Midgett v. Tri–County Metro. Transp. Dist.,* 254 F.3d 846, 850 (9th Cir.2001).

■ The Court does not believe that Plaintiff has sufficiently shown facts demonstrating an immediate threat of substantial harm.[5] First, the City took actions to

---

**5.** As previously noted, a disputed issue exists as to whether Sun Metro is required to pro-

address Plaintiff's complaints sometime in July and/or August 2005. Notably, Plaintiff does not allege that any bus driver required him to pay his PCA's bus fare after the City's remedial actions. Furthermore, the three isolated incidents of alleged rudeness to Plaintiff over the six-month period between the City's investigation and the filing of Plaintiff's complaint, while certainly regrettable, do not "support an inference that Plaintiff faces a real and immediate threat of *continued, future* violations of the ADA in the absence of injunctive relief." *Midgett,* 254 F.3d at 850 (refusing to issue an injunction against the transportation district of the City of Portland based on the plaintiff's evidence of "several frustrating, but isolated, instances of malfunctioning lift service" and of "a few individual … operators … not treat[ing] passengers as they are required and trained to do").

■ The Court is sympathetic to Plaintiff's plight, but is mindful of "the principles of federalism in determining the availability and scope of equitable relief," *Rizzo,* 423 U.S. at 379, 96 S.Ct. 598, which "have applicability where injunctive relief is sought … against those in charge of an executive branch of an agency of state or local governments," *id.* at 380, 96 S.Ct. 598. Indeed, "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins,* 495 U.S. 33, 51, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990). The Court finds that

the relative infrequency of the alleged ADA violations,[6] the City's apparent willingness to address Plaintiff's concerns, and the oversight of the Sun Metro system by the Federal Transit Authority make an injunction an inappropriate remedy in this case. *See Midgett,* 254 F.3d at 851 ("[T]he fact that Tri–Met is a local government agency with procedures already in place for monitoring … ADA compliance militates against a federal court's mandating substitute procedures of its own design to address the same issues."). Therefore, the Court finds that Defendant is entitled to summary judgment on Plaintiff's request for the issuance of an injunction against the City.

### C. Plaintiff's Payment for his PCA

Turning to Plaintiff's requests for relief regarding his previous payments for his PCA's fare on the fixed route system, Defendant argues that Plaintiff cannot satisfy the second and third elements of a prima facie discrimination claim. As previously stated, a plaintiff must demonstrate three elements in order to establish a prima facie case of discrimination under the ADA: (1) the plaintiff is disabled within the meaning of the ADA; (2) the plaintiff is "being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity;" and (3) "such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton,* 391 F.3d at 671–72.

---

vide free transit to PCAs on its fixed route system. As for the alleged rudeness of the bus drivers, the Court has already determined that such actions do not rise to the level of actionable harassment, assuming such a claim is cognizable under Title II of the ADA. However, for purposes of its injunction analysis, the Court will assume that such actions constitute ADA violations since it believes an injunction is not warranted in any event.

**6.** Plaintiff estimates that he rides about fifteen buses per week. Def.'s Mot., App. 215. During the thirty-week period between the City's response to Plaintiff's concerns and the filing of the complaint, Plaintiff rode the bus approximately 450 times, and alleges that he suffered three unpleasant encounters.

Sun Metro allows the personal care attendants of qualified individuals with disabilities to ride for free both on its fixed route system and the LIFT, its complementary paratransit service. It is uncontested that under the regulations promulgated by the Secretary of Transportation, Sun Metro is required to allow PCAs to ride for free only on the LIFT. 49 C.F.R. § 37.131(c)(3). However, Plaintiff alleges that the City violated the ADA each time Plaintiff had to pay the fare of his PCA on the fixed route system.[7] Defendant does not contest that Plaintiff occasionally had to pay for his PCA in violation of the City's policy. Rather, Defendant argues that the City is not *required* under the ADA to allow PCAs to ride for free on its fixed route system, and therefore, the violations of the City's policy do not satisfy the second element of a prima facie ADA discrimination claim. Def.'s Mot. ¶ 13. Accordingly, the Court must determine whether Defendant is correct that as a matter of law, the bus drivers' various refusals to allow Plaintiff's PCA to ride for free on the fixed route system do not constitute discrimination under the ADA. If providing free fare to PCAs on the fixed route system was part of the City's FTA-approved plan at the time of the alleged incidents, then the incidents do constitute discrimination. 42 U.S.C. § 12143(e) ("As used in subsection (a) of this section, the term 'discrimination' includes—... (4) a failure of such entity to provide paratransit or other special transportation services in accordance with the plan or modified plan the public entity submitted to the Secretary under this section."); *see Melton,* 391 F.3d at 675 ("Once the plan is approved,

the public entity is required to provide paratransit services in accordance with the plan. Providing paratransit services not in accordance with the plan is the prohibited discrimination.").

Plaintiff maintains that the City allows PCAs to ride for free on its fixed route system because of its need to take corrective action after the FTA issued an Assessment of ADA Complementary Paratransit Service Capacity Constraints in May 2001, finding that "there appears to be a substantial number of trip denials." Pl.'s Resp., Ex. 3 p. 10. Defendant argues that it began allowing PCAs to ride free of charge on the fixed route system in 1993, and provides an affidavit of a Sun Metro employee and a Sun Metro memo as evidentiary support. Def.'s Mot., App. 4, 16. The Court finds that the evidence offered by Plaintiff indicates that the City proposed to allow the disabled individuals themselves, not their PCAs, to ride for free on the fixed route system in order to address the concerns reflected in the May 2001 FTA report. Pl.'s Resp., Ex. 9, 10; Def.'s Mot., App. 183.

However, Sun Metro's original ADA paratransit plan of January 26, 1992, submitted to and approved by the FTA, states: "Beginning April 1, 1992, Sun Metro will permit a personal care attendant to accompany any certified ADA paratransit eligible person to accompany them at no charge." Def.'s Mot., App. 33. The plan does not specify whether this rule applied only to the LIFT service, or to the fixed route system as well. Furthermore, in the same paragraph containing the provision about the free fare for PCAs, the plan

7. Plaintiff states in his Response that he "is not seeking relief in these proceedings because he had to pay a few dollars, over a 26–month period, for PCA transportation services which should have been free," and that the "gravamen of [his] complaints is ... [the] severe and pervasive harassment by certain of

Defendant's drivers" to which he has been subjected. Pl.'s Resp. 6. These alleged violations, therefore, are not the driving force behind the filing of Plaintiff's Complaint, but must nevertheless be addressed, even if they are of lesser importance to Plaintiff.

specifies that "[o]ne additional guest or escort may accompany any rider *on a paratransit trip* if requested at the time of scheduling." *Id.* (emphasis added). The phrase "on a paratransit trip" would have been unnecessary if the paragraph as a whole described only the paratransit services and not the fixed route system.

Furthermore, the federal regulation requiring PCAs to ride for free on complementary paratransit services was in effect before Sun Metro submitted its plan to the FTA in January 1992. 49 C.F.R. § 37.131(c)(3) (1991). In Sun Metro's January 1992 plan, it determined the existing deficiencies with its LIFT service; the failure to comply with the regulation requiring PCAs to ride for free on the complementary paratransit service is not among the listed deficiencies. Def.'s Mot., App. 32. Moreover, Sun Metro stated that its policy of allowing PCAs to ride for free would go into effect April 1, 1992, well after federal law required PCAs to ride for free on the complementary paratransit service. *Id.*, App. 33. Accordingly, the Court finds that there is a genuine issue of disputed material fact as to whether Defendant's FTA-approved plan contained the provision that personal care attendants would ride for free on the fixed route system. If the plan did provide that PCAs would ride for free on the fixed route system, then Defendant's failure to comply with the FTA-approved plan would constitute discrimination as defined by the ADA. 42 U.S.C. § 12143(e)(4).

A finding that the City has discriminated against Plaintiff in one of the specific ways proscribed by the ADA would also satisfy the third element of a prima facie discrimination case, whether the discrimination was "by reason of his disability." *Melton,* 391 F.3d at 671–72. In the context of public transportation, the Fifth Circuit has stated that a court must look to the definitions of discrimination provided within the ADA to determine whether the alleged discrimination was on the basis of the plaintiff's disability. *Id.* at 672. As previously stated, Plaintiff alleges that Defendant has discriminated against him by failing to comply with its FTA-approved plan, thus satisfying the second element of an ADA claim. Furthermore, failure to comply with an FTA-approved plan is one of the forms of discrimination specifically proscribed by Title II of the ADA. 42 U.S.C. § 12143(e)(4). Therefore, Plaintiff has shown that such discrimination was on the basis of his disability. Accordingly, the Court finds that Plaintiff has satisfactorily alleged a prima facie case of ADA discrimination, and Defendant is not entitled to summary judgment on Plaintiff's claim that the City violated the ADA in requiring Plaintiff to pay the fare for his PCA on the fixed route system.

### D. Compensatory Damages

In order to recover compensatory damages for ADA violations, a plaintiff must prove that the discrimination was intentional. *Delano–Pyle v. Victoria County, Tex.,* 302 F.3d 567, 574 (5th Cir. 2002). A plaintiff, however, need not show that the intentional discrimination was the result of an official policy or attributable to a policymaker. *Id.* Rather, a public entity is vicariously liable for the discriminatory acts of its agents. *See id.* (finding that videotape of sheriff's deputy administering sobriety tests to severely hearing-impaired plaintiff despite the plaintiff's apparent inability to understand the deputy's instructions supported jury's finding of intentional discrimination by the county). Therefore, Plaintiff must demonstrate that the bus drivers intentionally failed to comply with the City's FTA-approved plan. Plaintiff alleges that at least once, on July 15, 2004, the bus driver in question was informed by another Sun Metro driver about Plaintiff's PCA privileges, to which the bus

driver responded, "Not on my route." Pl.'s Resp., Ex. 13 ¶ 4. That driver allegedly gave Plaintiff the choice of paying for his PCA or getting off the bus, and when Plaintiff refused to do either, the driver called a security guard. *Id.*, Ex. 13 ¶ 5. Plaintiff claims that he repeatedly asked the driver and the security guard to call Sun Metro to verify that his PCA could ride for free. *Id.*, Ex. 13 ¶ 6. The Court finds that the foregoing facts establish a genuine issue of disputed fact as to whether the alleged discrimination was intentional, and that Defendant is not entitled to summary judgment on Plaintiff's claim for compensatory damages relating to Plaintiff's previous payments for his PCA on the City's fixed route system.

## IV. CONCLUSION

In summary, the Court finds that Plaintiff fails as a matter of law to state an actionable claim for disability-based harassment because the alleged harassment was not sufficiently severe or pervasive. Furthermore, the Court holds that Plaintiff has failed to demonstrate an immediate threat of substantial harm such as would warrant the extraordinary remedy of an injunction against a local government. While the Court is particularly sympathetic to the embarrassment and discomfort suffered by Plaintiff given the nature of his illness, the Court is also mindful that "not all suffering—no matter how great, no matter how unmerited—gives rise to a compensable legal action." *Gowesky*, 321 F.3d at 512. The Court acknowledges that it cannot craft an order requiring decent common courtesy be extended to Plaintiff and other mass transit patrons. Defendant, however, may certainly be in a better position to address this issue. Accordingly, the Court concludes that Defendant is entitled to judgment as a matter of law with respect to Plaintiff's requests for damages stemming from the City's alleged harassment of

Plaintiff and for a permanent injunction against the City. However, the Court finds that Defendant's Motion for Summary Judgment should be denied to the extent Defendant seeks summary judgment on Plaintiff's claims for damages relating to the incidents in which Plaintiff paid the fare for his PCA on the fixed route system.

Accordingly, **IT IS ORDERED** that Defendant City of El Paso's "Motion for Summary Judgment" is **GRANTED IN PART AND DENIED IN PART.**